No. 24-6072

# In the United States Court of Appeals for the Tenth Circuit

ANDREW BRIDGE, *et al.*,

*Plaintiffs-Appellants*,

v.

OKLAHOMA STATE DEPARTMENT OF EDUCATION, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Oklahoma
Case No. 5:22-CV-787-JD, The Honorable Judge Jodi Dishman

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

## ORAL ARGUMENT REQUESTED

Megan Lambert (OBA 33216)
Devraat Awasthi (OBA 35544)
AMERICAN CIVIL LIBERTIES UNION
OF OKLAHOMA FOUNDATION
P.O. Box 13327
Oklahoma City, OK 73113
(405) 525-3831
mlambert@acluok.org
dawasthi@acluok.org

Jon W. Davidson
(admitted only in California)
Harper S. Seldin
(admitted only in Pennsylvania)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Isaac D. Chaput
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
ichaput@cov.com

Robert C. Gianchetti
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
rgianchetti@cov.com

Paul D. Castillo

(323) 536-9880
jondavidson@aclu.org
hseldin@aclu.org

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Ave., Ste. 500
Dallas, TX 75219
(214) 219-8585
pcastillo@lambdalegal.org

*Counsel for Plaintiffs-Appellants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF RELATED CASES ........................................... 1

STATEMENT OF JURISDICTION............................................... 2

STATEMENT OF ISSUES........................................................... 4

INTRODUCTION ....................................................................... 5

STATEMENT OF THE CASE ...................................................... 9

      A.    Andrew's Experience in Oklahoma as a Transgender
Student.................................................................... 9

      B.    Mark's Experience in Oklahoma as a Transgender
Student................................................................... 16

      C.    Sarah's Experience in Oklahoma as a Transgender
Student................................................................... 19

      D.    Oklahoma's Targeting of Transgender Students
Through a Discriminatory Restroom Law............................ 21

      E.    The Harm that Oklahoma's Discriminatory Restroom
Law Inflicts on Andrew, Mark, Sarah, and Other
Oklahoma Students ............................................... 24

PROCEDURAL HISTORY ....................................................... 26

STANDARD OF REVIEW......................................................... 29

SUMMARY OF ARGUMENT ................................................... 31

ARGUMENT ............................................................................. 32

I.    THE STUDENTS ADEQUATELY STATE AN EQUAL
PROTECTION CLAIM. ................................................... 32

      A.    The Students Plausibly Allege Facts Establishing that
S.B. 615 and Defendants' Policies Discriminate Against

the Students on the Basis of Sex, Calling for
Heightened Scrutiny. ............................................. 34

B. The Students Plausibly Allege Facts Establishing that
S.B. 615 and Defendants' Policies Discriminate Against
the Students on the Basis of Transgender Status,
Calling for Heightened Scrutiny. ........................... 39

C. The Students Plausibly Allege Facts Showing that
S.B. 615 and Defendants' Policies Have No Exceedingly
Persuasive Justification and Therefore Cannot Survive
Heightened Scrutiny. ............................................. 45

D. *Etsitty* Does Not Justify S.B. 615's Reliance on Sex
Stereotypes. .......................................................... 52

II. THE STUDENTS ADEQUATELY STATE A TITLE IX
CLAIM. ........................................................................ 55

A. The Students Plausibly Allege Facts Showing that S.B.
615 and the School District Defendants' Policies
Constitute Discrimination on the Basis of Sex. ................... 56

B. The District Court Erred in Relying on 20 U.S.C.
§ 1686 and 34 C.F.R. § 106.33 To Dismiss the Title IX
Claim. .................................................................... 60

CONCLUSION ................................................................... 65

CERTIFICATE OF COMPLIANCE ...................................... 66

STATEMENT REGARDING ORAL ARGUMENT ................. 67

CERTIFICATE OF SERVICE ............................................. 68

CERTIFICATE OF DIGITAL SUBMISSION ....................... 69

10TH CIR. R. 28.2(A) ATTACHMENTS ............................. 70

I. Order Granting State Defendants' Motion to Dismiss (W.D.
Okla. Jan. 12, 2024), ECF No. 107 ................................. 70

II.    Order Granting School District Defendants' Motion for
       Judgment on the Pleadings (W.D. Okla. Mar. 22, 2024), ECF
       No. 117 ................................................................................................ 70

III.   Final Judgment (W.D. Okla. Mar. 22, 2024), ECF No. 118 .......... 70

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.C. by M.C. v. Met. Sch. Dist. of Martinsville*,
    75 F.4th 760 (7th Cir. 2023) ...................................................... 36, 59, 63

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*,
    57 F.4th 791 (11th Cir. 2022) ................................................................ 40

*Acosta v. Jani-King of Okla., Inc.*,
    905 F.3d 1156 (10th Cir. 2018) ............................................................. 29

*Adkins v. City of N.Y.*,
    143 F. Supp. 3d 134 (S.D.N.Y. 2015) .................................................... 43

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................. 29

*U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*,
    79 F.4th 1262 (10th Cir. 2023) ............................................................. 55

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ..................................... 36, 43, 44

*Bishop v. Okla. ex rel. Edmondson*,
    447 F. Supp. 2d 1239 (N.D. Okla. 2006) .............................................. 30

*Bostock v. Clayton Cty.*,
    590 U.S. 644 (2020) ................................. 8, 32, 39, 54, 55, 57, 58, 59, 64

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ............................................................................. 40

*Brocksmith v. United States*,
    99 A.3d 690 (D.C. 2014) ...................................................................... 43

*Burlington N. & S.F.R Co. v. White*,
    548 U.S. 53 (2006) ............................................................................... 63

*Califano v. Goldfarb*,
430 U.S. 199 (1977) ...................................................................... 49

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ...................................................................... 42

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015) ...................................................................... 40

*Clinton v. Sec. Benefit Life Ins. Co.*,
63 F.4th 1264 (10th Cir. 2023) ................................................ 29, 30

*Colo. Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) ...................................................... 48

*Dodds v. U.S. Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) ................................................... 36, 60

*Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018) .................................................... 38, 50

*Doe v. Ladapo*,
2024 WL 2947123 (N.D. Fla. June 11, 2024)
.......................................................................... 36, 42, 43, 48

*Doe ex rel. Doe v. Rocky Mountain Classical Acad.*,
99 F.4th 1256 (10th Cir. 2024) ..........................7, 31, 35, 45, 49, 52

*Etsitty v. Utah Transit Auth.*,
502 F.3d 1215 (10th Cir. 2007)................... 8, 41, 52, 53, 54, 55, 67

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017) .......................................... 36, 51

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) ... 6, 8, 29, 32, 39, 40, 46, 47, 48, 54, 55, 58, 59, 64, 67

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019)................................................ 45, 50, 52

*Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*,
    245 F.3d 1172 (10th Cir. 2001) ............................................ 58

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ...................... 36, 38, 43, 50, 56, 59, 60, 62

*A.H. ex rel. Handling v. Minersville Area Sch. Dist.*,
    408 F. Supp. 3d 536 (M.D. Pa. 2019) ................................... 51

*Hernandez-Montiel v. INS*,
    225 F.3d 1084 (9th Cir. 2000) ............................................. 44

*Hogan v. Okla. Dep't of Corr.*,
    24 F. App'x 984 (10th Cir. 2002) ......................................... 30

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*,
    396 F. Supp. 3d 833 (S.D. Ind. 2019) .................................. 36

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ..................................................... 58, 62

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ............................................. 43

*Lyng v. Castillo*,
    477 U.S. 635 (1986) ..................................................... 42, 43

*Murray v. UBS Sec., LLC*,
    601 U.S. 23 (2024) ........................................................... 55

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) .......................................................... 40

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) .......................................................... 58

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ............................................. 50

*Ray v. McCloud*,
    507 F. Supp. 3d 925 (S.D. Ohio 2020) ................................. 36

*Sessions v. Morales-Santana,*
  582 U.S. 47 (2017) ............................................................................. 45

*Turner v. City of Tulsa,*
  525 F. App'x 771 (10th Cir. 2013) ..................................................... 29

*United States v. Virginia,*
  518 U.S. 515 (1996) ............................................................... 40, 49, 53

*Vitolo v. Guzman,*
  999 F.3d 353 (6th Cir. 2021)............................................................... 30

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1
  Bd. of Educ.,*
  858 F.3d 1034 (7th Cir. 2017)............................................36, 49, 51, 60

*Windsor v. United States,*
  699 F.3d 169 (2d Cir. 2012) ......................................................... 43, 44

**Statutes**

20 U.S.C. § 1681......................................................................2, 56, 62, 64

20 U.S.C. § 1686........................................................8, 32, 60, 61, 62, 64

28 U.S.C. § 1291 ...................................................................................... 3

28 U.S.C. § 1331 ...................................................................................... 2

28 U.S.C. § 1343 ...................................................................................... 2

**Other Authorities**

U.S. Const. amend. XIV.................................................................... 2, 5

34 C.F.R. § 106.10 ................................................................................. 64

34 C.F.R. § 106.31 ................................................................................. 64

34 C.F.R. § 106.33 .....................................................................60, 61, 62

45 C.F.R. 86.32.................................................................................... 64

45 C.F.R. 86.33 ............................................................................. 64

89 Fed. Reg. 33474 (Apr. 29, 2024) ........................................... 64

Esther L. Meerwijk & Jae M. Sevelius, *Transgender
    Population Size in the United States: A Meta-Regression of
    Population-Based Probability Samples*, 107(2) Am. J. Pub.
    Health (Feb. 2017) ................................................................. 44

Fed. R. Civ. P. 12(b)(6) ................................. 2, 4, 26, 29, 31, 38, 45, 49, 52

Fed. R. Civ. P. 12(c) ................................................... 2, 4, 28, 29

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Plaintiffs' claims arise under the Fourteenth Amendment to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claims arise under federal law.

On January 12, 2024, the district court granted the motion to dismiss filed by Defendants Oklahoma State Department of Education, State Superintendent of Public Instruction Ryan Walters, Donald Burdick, Katie Quebedeaux, Zach Archer, Kendra Wesson, Trent Smith, Sarah Lepak, and Gentner Drummond (the "State Defendants"), pursuant to Fed. R. Civ. P. 12(b)(6).

On March 22, 2024, the district court granted the motion for judgment on the pleadings filed by Defendants Independent School District No. 40 of Cleveland County, Oklahoma, Independent School District No. 2 of Cleveland County, Oklahoma, Independent School District No. 89 of Oklahoma County, Oklahoma, and Harding Independence Charter District, Inc. (the "School District Defendants"), pursuant to Fed. R. Civ. P. 12(c).

2

The district court entered final judgment on March 22, 2024, and Plaintiffs timely filed a notice of appeal on April 19, 2024. This Court has jurisdiction under 28 U.S.C. § 1291.

## <u>STATEMENT OF ISSUES</u>

1.    Did the district court err in dismissing Plaintiffs' Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c)?

## **INTRODUCTION**

Andrew Bridge, Mark Miles, and Sarah Stiles ("Plaintiffs" or "Students") claim that Oklahoma's S.B. 615 and Defendants' related policies deny the Students equal protection of the law based on their sex and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and subject them to discrimination on the basis of sex in violation of Title IX.

At the time of the Complaint's filing, the Students were Oklahoma public school or public charter school students.[1]  Andrew and Mark are both boys, and Sarah is a girl.  Each of them also is transgender.  Prior to August 2022, each of them used the restrooms at their schools that correspond with the sex they know themselves to be.  But, beginning in the 2022–23 school year, S.B. 615 and Defendants' policies prohibited the Students from using those restrooms because the sex listed on the Students' original birth certificates did not match the sex designation of those restrooms.  As alleged in the Complaint, Defendants' conduct fails

---

[1] Since the Complaint was filed, Andrew graduated from high school and is now attending college in Oklahoma, and Sarah and her family have moved out of Oklahoma.  Because Mark is still enrolled in Moore Public Schools and because all the Students seek declaratory relief and nominal damages, the Students' claims are not moot.

to treat the Students like other similarly situated Oklahoma students. Instead, the Students were treated differently because of their sex assigned at birth, because each of them is transgender, and because of their nonconformity with certain sex stereotypes.

The Students' claims rely on factual allegations related to sex and gender identity, terms whose familiar use can lead one to gloss over what is required to accurately understand what sex and gender identity are and how they function in people's lives. This Court has previously declined to take a "position on the correct way to define sex" at the motion to dismiss stage, instead emphasizing that the court "must accept Plaintiffs' well pleaded facts as true and view those facts in the light most favorable to Plaintiffs." *Fowler v. Stitt*, 104 F.4th 770, 775 n.2 (10th Cir. 2024). As explained below, the Students' allegations state plausible claims for relief more than sufficient to withstand motions to dismiss on the pleadings. Having met this low threshold, the Students are entitled to an opportunity to develop and present evidence in support of their claims.

In ruling on the motions, rather than accepting the Students' well-pleaded allegations and viewing those facts in the light most favorable to

the Students as required, the district court adopted its own conception of
"*biological sex*" and made determinations of fact inconsistent with the
Students' allegations, including as to the issue of justification on which
*Defendants* ultimately bear the burden of proof.  The district court agreed
that, under the Equal Protection Clause, S.B. 615 and Defendants'
policies classified the Students on the basis of sex.  As a matter of law,
this conclusion shifted the burden to Defendants to establish an
"exceedingly persuasive" justification showing that their discrimination
serves "important governmental objectives" through means substantially
related to achieving those objectives.  *Doe ex rel. Doe v. Rocky Mountain
Classical Acad.*, 99 F.4th 1256, 1260 (10th Cir. 2024).

Despite the Government's heavy burden of proof, the district court
dismissed the Students' claims on the pleadings because it thought that
S.B. 615 and Defendants' policies are substantially related to the
important governmental objectives of safety and privacy as a matter of
law.  In doing so, the district court erroneously disregarded the Students'
substantial factual allegations that S.B. 615's unexplained and
unsubstantiated reference to privacy and safety is nothing but a pretext
to target students who are transgender.  The district court further erred

7

by misapplying *Etsitty v. Utah Transit Authority*, 502 F.3d 1215 (10th Cir. 2007), which does not control and, in any event, has been overruled by subsequent Supreme Court precedent, as this Court recognized just last month in *Fowler*.

The district court further erred in finding that the Students had failed to state a Title IX claim. As the Supreme Court held in *Bostock v. Clayton County*, 590 U.S. 644 (2020), discrimination on the basis of transgender status necessarily amounts to discrimination on the basis of sex. Multiple courts have applied the Supreme Court's reasoning in *Bostock* to claims asserted under Title IX. In failing to do so here and instead dismissing the Students' claim on the pleadings, the district court erred as a matter of law. The district court further erred in relying on 20 U.S.C. § 1686, which permits separate "living facilities" for different sexes, to dismiss the Students' claim. Section 1686 does not override Title IX's general prohibition against discrimination or otherwise excuse the discrimination the Students challenge.

As a result of these errors, the district court wrongly deprived the Students of an opportunity to prove their claims. In several other cases involving challenges to similar legislation and policies, federal courts

have heard evidence on the relevant issues and ruled in favor of the plaintiffs in those cases. The Students should have the same opportunity here. At a minimum, the Students have alleged plausible Equal Protection and Title IX claims, and, at this early stage of litigation, they are entitled to further develop the facts underlying their claims. Dismissal of their claims should therefore be reversed.

## <u>STATEMENT OF THE CASE</u>

At the time the Complaint was filed, the Plaintiffs—Andrew, Mark, and Sarah—were attending school under compulsion of State law. Compl. ¶ 59 (A-0029). Like most students, Plaintiffs attend school to learn, develop friendships, and prepare themselves for higher education and success throughout their adult lives. *Id.*

### A.    Andrew's Experience in Oklahoma as a Transgender Student[2]

When the Complaint was filed, Andrew was 16 years old and was a registered student at Noble High School, which is part of the Noble Public

---

[2] When reviewing a motion to dismiss, this Court has previously emphasized that it takes "no position on the correct way to define sex or treat gender dysphoria. But at this stage in the litigation, [the Court] must accept Plaintiffs' well pleaded facts as true and view those facts in the light most favorable to Plaintiffs." *Fowler*, 104 F.4th at 775 n.2. The Students' allegations here regarding sex and gender identity must also be accepted as true for purposes of reviewing the district court's grant of the motions to dismiss.

Schools in Noble, Oklahoma. *Id.* ¶ 61 (A-0029). Andrew is a boy. *Id.* ¶ 60 (A-0029). He also is transgender. *Id.*

At birth, Andrew was designated as "female" on his birth certificate, even though he is a boy. *Id.* ¶ 63 (A-0029–30). When a child is born, healthcare providers typically make an initial sex designation at birth based on a visual assessment of the infant's external genitalia. *Id.* ¶ 26 (A-0019). This is the sex that is most commonly listed on a person's original birth certificate. *Id.* But every person has multiple sex-related characteristics, including several distinct biologically-influenced characteristics such as chromosomal makeup, hormones, internal and external organs and genitalia, secondary sex characteristics, and—most importantly—gender identity. *Id.* ¶ 24 (A-0019). Gender identity is a person's sense of self with respect to their sex. *Id.* ¶ 25 (A-0019). All individuals have a gender identity and, although the biological mechanisms are not fully known, there is a medical consensus that gender identity is based in significant part on a person's biology. *Id.* ¶ 24 (A-0019). Gender identity is durable, deeply rooted, and cannot be changed by social or medical intervention. *Id.* ¶ 25 (A-0019). In cases where a person's sex-related characteristics diverge, that person's gender

identity is the most important and determinative factor in establishing their sex, *i.e.*, their gender identity determines, and is thus the same as, their sex. *Id.* ¶ 24 (A-0019).

As in Andrew's case, not everyone's gender identity aligns with the sex that a doctor initially assigned them at birth. *Id.* ¶ 27 (A-0019–20). The words "cisgender" and "transgender" are used to refer to a person's relation to the initial designation of their sex. Most people are cisgender, meaning that their gender identity and sex align with the sex they were assigned at birth. *Id.* ¶ 26 (A-0019). A girl who is cisgender has a female gender identity and was assigned female at birth. *Id.* A boy who is cisgender has a male gender identity and was assigned male at birth. *Id.* People who are cisgender have a consistent, persistent, and insistent understanding that their sex is the same as the sex they were assigned at birth. *Id.* ¶ 28 (A-0020).

By contrast, a person is transgender if they have a gender identity and sex that does not align with their sex assigned at birth. *Id.* ¶ 27 (A-0019–20). A girl who is transgender has a female gender identity although she was assigned male at birth. *Id.* A boy who is transgender has a male gender identity although he was assigned female at birth. *Id.*

People who are transgender have a consistent, persistent, and insistent understanding that their sex is different from the sex they were assigned as at birth. *Id.* ¶ 28 (A-0020).

Andrew started to feel uncomfortable with his body at the onset of puberty and, after many discussions with his therapist, physician, and supportive friends, and after extensive reading and thinking about gender identity, Andrew felt ready to come out to his family as transgender, which he did during the summer of 2020. *Id.* ¶¶ 63–64 (A-0029–30).

Because of increased access to support from health care providers, their families, and their communities, many students who are transgender take steps to live in a way consistent with their gender identity. This may include using names and pronouns and wearing clothing or hairstyles that are more typically associated with their gender identity. *Id.* ¶ 41 (A-0024).[3]

As Andrew came to understand his identity as a boy, he began taking steps towards aligning his life with his gender identity. *Id.* ¶ 64

---

[3] If a transgender student takes these steps before starting school or transferring to a new school, the student may attend school without classmates knowing they are transgender. Compl. ¶ 41 (A-0024).

(A-0030). Andrew cut his hair short and began wearing more masculine clothing. *Id.* He told his close friends about his name and pronouns. Each gradual step of his transition brought him a sense of relief and happiness, and he felt that he was finally starting to live the way he was meant to live. *Id.*

The ability to live in a way consistent with one's gender identity is critical to the health and well-being of people who are transgender, and that is particularly the case for young people who are transgender. *Id.* ¶ 39 (A-0023). Some people who are transgender experience sustained and clinically significant distress caused by the incongruence between their gender identity and their sex assigned at birth. The American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders diagnostic term for this sustained and clinically significant distress is "Gender Dysphoria." *Id.* ¶ 29 (A-0020). Not all people who are transgender experience gender dysphoria; to constitute gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning. *Id.* ¶¶ 29–30 (A-0020).

Andrew was diagnosed with gender dysphoria and began receiving treatment in June 2021. *Id.* ¶¶ 65–66 (A-0030). The medical treatment for gender dysphoria is to reduce or eliminate clinically significant distress by helping a person who is transgender live in a way consistent with their gender identity. This treatment is sometimes referred to as "gender transition," "transition related care," or "gender affirming care." *Id.* ¶ 32 (A-0020–21).

The goal of treatment for gender dysphoria is to align the body and life of a person who is transgender with their gender identity. *Id.* ¶ 33 (A-0021). Generally, treatment in accordance with the Standards of Care published by the World Professional Association for Transgender Health may include: (1) social transition; (2) hormone therapy; and/or (3) gender-affirming surgeries. *Id.* But the precise treatment for gender dysphoria depends upon each person's individualized needs, and the medical standards of care and treatment differ across age groups, depending on whether the person suffering from gender dysphoria is a prepubertal child, adolescent, or adult. *Id.* For example, for a boy who is transgender, social transition can include, among other things, changing his first name to a name typically associated with boys, using

male pronouns, changing his identity documents to reflect his male sex, wearing clothing and modifying his appearance to that stereotypically associated with boys, using restrooms and other facilities designated for boys, and otherwise living as a boy in all aspects of life. *Id.* ¶ 35 (A-0021–22). Similar steps (but geared to female identity) are included in social transition for a girl who is transgender. *Id.*

During Andrew's junior year in August 2021, his name was changed on his school records where possible, and teachers were informed that he uses male pronouns. *Id.* ¶ 67 (A-0030). At school, students and staff alike generally perceived him as a boy. *Id.* His peers and teachers generally used male pronouns to refer to him, and he was generally treated as the boy he is in every respect. *Id.*

Andrew consistently used the boys' restrooms at school for the entire 2021–22 school year with the knowledge and support of school administration. *Id.* ¶ 68 (A-0030–31). He knew that he belonged in the boys' restroom, so he simply used the boys' restrooms along with the other boys. *Id.* Andrew always used one of the individual stalls, just as he continues to do in every other setting where he uses male restrooms. *Id.*

Prior to the start of the 2022–23 school year, Andrew and his mother spoke with the principal and vice principal at his school regarding the school district's restroom policy. *Id.* ¶ 69 (A-0031). Andrew was informed that he would have access to a single-occupancy restroom and that if the school received any complaints about a transgender student using the "wrong" restroom, the student would be counseled to use other restrooms. *Id.* Andrew was told that if he continued using the boys' restroom after being counseled, he would be subject to further discipline. *Id.* Being banned from the boys' restroom made Andrew feel singled out and stigmatized. *Id.* ¶ 71 (A-0031). Andrew just wants to be treated with the same dignity and respect as other boys. *Id.*

## B. Mark's Experience in Oklahoma as a Transgender Student

When the Complaint was filed, Mark was a registered student at Moore Public Schools' high school in Oklahoma City, Oklahoma. *Id.* ¶ 73 (A-0032). Mark is a boy. *Id.* ¶ 72 (A-0031). He also is transgender. *Id.* At birth, Mark was designated as "female" on his birth certificate, even though he is a boy and has known from a very young age that he is a boy. *Id.* ¶ 75 (A-0032). As a child, Mark told people that he was a boy, and he never wanted to wear feminine clothing, such as dresses and skirts. *Id.*

16

He never wanted to play with what are traditionally thought of as "girl" toys and would only play with what are traditionally thought of as "boy" toys. *Id.*

It was not until Mark was ten that he knew what being "transgender" was. *Id.* ¶ 76 (A-0032). During the summer of 2018, shortly after finding the language to describe himself, he came out to his family as transgender—everyone was accepting and supportive of him. *Id.* Mark was diagnosed with gender dysphoria and started receiving treatment in July 2019. *Id.* ¶¶ 78–79 (A-0032–33).

After coming out, Mark began taking steps towards aligning his lived experience with his gender identity. *Id.* ¶ 77 (A-0032). He cut his hair short, and his family began to use his correct pronouns and current name. *Id.* During his freshman year beginning in August 2021, Mark obtained a legal name change, which was reflected in his school records. At school, he was generally perceived by students and staff alike as a boy, with peers and teachers using male pronouns for him. *Id.* ¶ 81 (A-0033). Mark was generally treated as a boy in every respect. *Id.* Each step he took in his transition made Mark feel more and more like his true self. *Id.* ¶ 77 (A-0032).

Mark has consistently used male restrooms in public since 2019 without incident and began using the boys' restroom at school at the start of the 2021–22 school year. *Id.* ¶¶ 80–81 (A-0033). He has always used one of the stalls, and he continues to do so in every other setting where he uses male restrooms. *Id.* ¶ 82 (A-0033). Nevertheless, in January 2022, a teacher informed the freshman principal that Mark was using the boys' restroom. *Id.* ¶ 83 (A-0033). The freshman principal contacted Mark and his parents and informed them that it was Moore Public Schools' policy that students must use the restroom that matches the sex they were assigned at birth. *Id.* Mark was told that he had to use the single-occupancy faculty restroom. *Id.* Despite this policy, Mark continued to use the boys' restroom at school just as he uses male restrooms in all other public spaces. *Id.* ¶ 90 (A-0035).

Mark is upset by not being allowed to use the boys' restroom at school, which also heightens his gender dysphoria. *Id.* ¶ 87 (A-0034). Mark feels that being required to use a separate restroom makes it more likely that his classmates will discover he is transgender. *Id.* Worrying about this often distracts Mark from his schoolwork. *Id.*

### C. Sarah's Experience in Oklahoma as a Transgender Student

At the time the Complaint was filed, Sarah was a registered student at Independence Charter Middle School ("ICMS"), which is operated by Harding Independence Charter District, Inc. in Oklahoma City, Oklahoma. *Id.* ¶ 92 (A-0035). Sarah is a girl. *Id.* ¶ 91 (A-0035). She also is transgender. *Id.* At birth, Sarah was designated as "male" on her birth certificate, even though she is a girl. *Id.* ¶ 94 (A-0035).

In the summer of 2021, Sarah told her parents that she was questioning her gender identity. *Id.* ¶ 95 (A-0035–36). When she told her family, it felt like a huge weight off her chest. *Id.* As her family began using her correct name and pronouns, Sarah felt happy and euphoric. *Id.* Sarah has since been diagnosed with gender dysphoria, and she began pursuing medical treatment in April 2022. *Id.* ¶ 96 (A-0036).

During the 2021–22 school year, Sarah attended a different middle school where she was bullied and harassed for being transgender. *Id.* ¶ 97 (A-0036). Most of the bullying and harassment was due to the school's restroom policy, which required Sarah to use the boys' restroom. *Id.* In the boys' restroom, Sarah was assaulted multiple times. *Id.* Based

on how she was treated at her old school, Sarah's parents decided to enroll her at ICMS. *Id.* ¶ 98 (A-0036). Sarah and her mother were assured that Sarah would be permitted to use the multiple occupancy girls' restroom at ICMS. *Id.* ¶ 99 (A-0036–37). Sarah was excited about this because using the girls' restroom feels the most normal for her. *Id.*

At the start of the 2022–23 school year, Sarah used the girls' restroom at ICMS without incident. *Id.* ¶ 100 (A-0037). But after rules implementing S.B. 615 went into effect, Sarah and her family were told she could no longer use the girls' restroom. Sarah was told that she would instead need to use a single-occupancy restroom located in the classroom for in-school suspension. A trip to the single-occupancy restroom typically takes Sarah 4–6 minutes, meaning she cannot get to it during the four-minute passing periods and has to go during class time. *Id.* ¶¶ 101, 103, 105 (A-0037–38).

Despite all teachers being notified that Sarah has to use the single-occupancy restroom, a teacher has already complained about the length of time it takes Sarah to use the restroom. *Id.* ¶ 106 (A-0038). The teacher stated that Sarah's restroom trip took too long and that in the future she has three minutes to use the restroom. *Id.* A trip from that

specific classroom to the single-occupancy restroom is impossible for Sarah to make in under three minutes. *Id.* ¶ 106 (A-0038). The policy significantly disrupts Sarah's education by forcing her to choose between disruptive physical discomfort and missing extended periods of class. *Id.* ¶ 107 (A-0038–39).

The policy also puts Sarah at risk of disclosure that she is transgender, and she is nervous about this. *Id.* ¶ 104 (A-0038). Students who attend in-school suspension are able to see her accessing the single-occupancy restroom; one student even approached Sarah and asked why she was using that specific restroom. *Id.*

Sarah is upset because her exclusion from the girls' restroom treats her differently than every other girl at school and because it takes away from her opportunity to learn at school for no good reason. *Id.* ¶ 108 (A-0039). All she wants is to use the restroom that makes sense for her to use because of whom she knows herself to be and of how she appears to others, just like every other student. *Id.*

### D.    Oklahoma's Targeting of Transgender Students Through a Discriminatory Restroom Law

On January 21, 2022, Oklahoma State Senator David Bullard introduced S.B. 615 as a bill to amend Oklahoma's law regarding

inspection of sex education curricula. *Id.* ¶ 49 (A-0026). Among other things, the bill re-defined this law's term "sexual behavior or attitudes" to include "sexual orientation and gender identity." *Id.* But on April 28, 2022, following an untimely amendment, the Oklahoma House of Representatives voted to suspend Rule 8.8 of the House Rules to introduce an amendment to S.B. 615. *Id.* This amendment removed the original language and title of the bill and transformed it from a bill regarding sex education curricula to one mandating discrimination against students who are transgender by denying them equal access to multiple occupancy restrooms and changing areas. *Id.*

As enacted, S.B. 615 states that it was adopted "to ensure privacy and safety" at each public school and public charter school that serves students in prekindergarten through twelfth grade in Oklahoma. The Students allege (and are prepared to present evidence showing) that these purported "privacy" and "safety" concerns are without a basis in fact and constitute an unfounded pretext to target students who are transgender. *Id.* ¶¶ 51–52 (A-0027). The Students expect to show that students who are transgender pose no risks to the privacy or safety of

other students, whether in using multiple occupancy facilities or in any other context. *Id.* ¶ 52 (A-0027).

On August 25, 2022, Defendant members of the Oklahoma State Board of Education adopted emergency rules implementing Section 1(H) of S.B. 615 (the "SBOE Emergency Rules"), set forth in Title 210 of the Oklahoma Administrative Code as new Section 35-3-186(h). *Id.* ¶ 54 (A-0027–28). The rules mirror S.B. 615 by requiring every public school and public charter school serving students in prekindergarten through twelfth grade in Oklahoma to designate all multiple occupancy restrooms or changing areas for the exclusive use of either the male sex or the female sex, defined as "the physical condition of being male or female based on genetics and physiology, as identified on the individual's original birth certificate." *Id.* S.B. 615 and the SBOE Emergency Rules also require that schools provide what they label a "Reasonable Accommodation" by providing access to a single-occupancy restroom or changing room for individuals who do not wish to utilize the multiple occupancy restroom or changing area designated for their "sex" (as defined in S.B. 615). *Id.*

**E.    The Harm that Oklahoma's Discriminatory Restroom Law Inflicts on Andrew, Mark, Sarah, and Other Oklahoma Students**

S.B. 615, the SBOE Emergency Rules, and the School District Defendants' respective disciplinary policies or practices (collectively, "S.B. 615 and Defendants' Policies") harm students who are transgender, including Plaintiffs. *Id.* ¶ 58 (A-0029).

According to every major medical and mental health organization, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association, excluding boys and girls who are transgender from using the same restrooms as others with the same gender identity is harmful to the health and wellbeing of those transgender students. *Id.* ¶ 43 (A-0024–25). When excluded from the multiple occupancy restrooms that match their gender identity, students who are transgender often avoid using the restroom entirely. *Id.* Among other things, this can be because using single-occupancy restrooms signals to others that the student is transgender, is stigmatizing, or is impractical given how far the single occupancy restroom may be from a student's classes. *Id.* Students who avoid using a restroom that does not align with their

gender may also suffer infections and other negative health consequences. *Id.*

Excluding students who are transgender from the restrooms used by peers of the same gender identity also increases transgender students' risk of, or worsens, their anxiety, depression, suicidal ideation, and self-harm; could lead to suicide; and interferes with the treatment of, and may cause or increase the intensity of, their gender dysphoria. *Id.* Excluding boys and girls who are transgender from multiple occupancy restrooms that align with their gender identity also interferes with their ability to learn and thrive at school. In addition, it impairs their ability to develop a healthy sense of self, peer relationships, and the cognitive skills necessary to succeed in adult life. *Id.* ¶ 44 (A-0025).

In light of these harms, the National Association of School Psychologists, National Association of Secondary School Principals, National Association of Elementary School Principals, and the American School Counselor Association have all called upon schools to allow boys and girls who are transgender to use the same restrooms as their cisgender counterparts. *Id.* According to the American Academy of Pediatrics and other major medical and mental health organizations,

there is no evidence that allowing boys and girls who are transgender to use the same restrooms as their cisgender counterparts causes any harm to cisgender students. *Id.* ¶ 45 (A-0025).

Andrew, Sarah, Mark, and other Oklahoma students who are transgender, as well as transgender students across the country, have routinely and publicly used the same multiple occupancy facilities (*e.g.*, restrooms) as other boys and girls. *Id.* ¶ 47 (A-0026). Students who are transgender have been, are, and will continue to attend schools across the country, including in Oklahoma. *Id.* ¶ 40 (A-0023). Denying these students the opportunity to use restrooms consistent with their gender identity harms them for no good reason.

## PROCEDURAL HISTORY

The Students filed this action on September 6, 2022 against the State Defendants and the School District Defendants. A-0010. The School District Defendants answered the Complaint on October 5 and 6, 2022. On October 26, 2022, the State Defendants filed a motion to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). A-0118. The Students filed their opposition to that motion on November 16, 2022. A-0152.

On September 29, 2022, the Students moved for a preliminary injunction, arguing that S.B. 615 and its application discriminated against transgender students in violation of the Equal Protection Clause and Title IX, and absent an injunction the Students were likely to suffer irreparable harm. A-0261. On November 16, 2022, the School District Defendants filed a response taking no position on the merits of the Students' requested relief. *Id.* The same day, the State Defendants filed their opposition to the motion. *Id.*

On January 12, 2024, the district court granted the State Defendants' motion to dismiss. A-0243.[4] The district court held that S.B. 615 did not violate the Equal Protection Clause because, the court concluded, the State has an "important governmental interest in ensuring students are safe and have privacy from the opposite sex in restrooms" and S.B. 615 is substantially related to that objective. A-0251–53. The district court also held that S.B. 615 does not violate Title IX because while it "separates students and the restrooms they are

---

[4] In the same opinion, the district court denied the Students' motion for preliminary injunction with respect to the State Defendants as moot and denied the same relief with respect to the School District Defendants on the basis that "it is clear that Plaintiffs cannot show a substantial likelihood of success on the merits for their Motion." A-0259 & n.12. The Students have not appealed that ruling.

allowed to use based on biological sex," A-0256, according to the court, this is consistent with the meaning of "sex" as used in Title IX, and S.B. 615 falls under Title IX's exception that allows "schools to require that the different biological sexes use different living facilities such as restrooms," A-0258.

On February 5, 2024, the School District Defendants filed a motion for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking to dismiss the Students' claims in light of the court's January 12, 2024 order.  A-0260.  The district court granted this motion on March 22, 2024 "for the same reasons [the district court] granted the State Defendants' Motion to Dismiss."  A-0268–69.

The Students noticed this appeal on April 19, 2024.  A-0271.  The Students have appealed *only* the district court's decision with regard to the State Defendants' motion to dismiss and the School District Defendants' motion for judgment on the pleadings.  The Students do not challenge denial of their motion for preliminary injunction in this appeal.

## STANDARD OF REVIEW

This Court applies *de novo* review to a dismissal under Fed. R. Civ. P. 12(b)(6). *Fowler*, 104 F.4th at 781.[5] "Under this standard, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018). "If the complaint includes 'enough facts to state a claim to relief that is plausible on its face,' then dismissal is not warranted." *Fowler*, 104 F.4th at 781 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).

"[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton v. Sec.*

---

[5] This Court reviews dismissal of the Complaint against the School District Defendants pursuant to Fed. R. Civ. P. 12(c) under the same standard. *Turner v. City of Tulsa*, 525 F. App'x 771, 772 (10th Cir. 2013) ("[The Court] review[s] a district court's grant of a motion for judgment on the pleadings *de novo*, using the same standard that applies to a Rule 12(b)(6) motion.").

*Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023). "There is a low bar for surviving a motion to dismiss, and a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.*

Motions to dismiss concerning discrimination claims are often premature at the initial stage of the proceedings and must await summary judgment, at the earliest. *E.g.*, *Bishop v. Okla. ex rel. Edmondson*, 447 F. Supp. 2d 1239, 1258 (N.D. Okla. 2006), *rev'd on other grounds*, 333 F. App'x 361 (10th Cir. 2009) (denying motion to dismiss Equal Protection claim because "such challenges are more appropriately decided at the summary judgment stage"); *cf. Hogan v. Okla. Dep't of Corr.*, 24 F. App'x 984, 985 (10th Cir. 2002) ("Factual disputes between the parties cannot be resolved in a motion to dismiss.").

Judicial hesitation to dismiss claims of denial of equal protection based on sex prior to summary judgment or trial reflects the well-established principle that "sex-based discrimination is presumptively invalid." *Vitolo v. Guzman*, 999 F.3d 353, 364 (6th Cir. 2021). Once a plaintiff establishes that a government entity has engaged in sex-based discrimination requiring heightened scrutiny, the Government must

make an "exceedingly persuasive" showing that its discrimination serves "important governmental objectives" through means substantially related to achieving those objectives. *Rocky Mountain*, 99 F.4th at 1261. At the Rule 12(b)(6) stage, the Government "never ha[s] the opportunity to make such a showing," and those suing do not have the opportunity to contest what the Government may put forward, meaning such issues have not been "sufficiently developed such that a court could resolve it in favor of [the Government] on a 12(b)(6) motion." *Id*.

## SUMMARY OF ARGUMENT

The district court erred in dismissing the Complaint because the Students' allegations supported plausible claims that S.B. 615 and Defendants' Policies violate the Equal Protection Clause and Title IX.

*First*, the Students state a plausible claim under the Equal Protection Clause. The Students' allegations plausibly show that S.B. 615 and Defendants' Policies discriminate on the basis of sex and transgender status, requiring S.B. 615 to be evaluated under at least heightened scrutiny. They further show that S.B. 615 and Defendants' Policies lack any exceedingly persuasive justification to survive

heightened scrutiny. Nothing more was required of the Students to plead a viable Equal Protection claim.

*Second*, the Students' allegations plausibly show that S.B. 615 and Defendants' Policies discriminate against transgender students on the basis of sex in violation of Title IX because these policies prohibit transgender students, and transgender students alone, from using multiple occupancy school restrooms that are consistent with their sex. As *Bostock* and the Court's recent decision in *Fowler* make clear, discrimination against transgender people is necessarily discrimination based on sex. Moreover, 20 U.S.C. § 1686 does not undercut Title IX's basic prohibition on sex-based discrimination. The Students therefore adequately state a claim under Title IX as well, and the dismissal of the Students' Complaint must be reversed.

## ARGUMENT

## I. THE STUDENTS ADEQUATELY STATE AN EQUAL PROTECTION CLAIM.

S.B. 615 and Defendants' Policies forbid each of the Students from using the school restrooms that correspond with their sex. Andrew and Mark are boys barred from the boys' room, and Sarah is a girl barred from the girls' room because each Student's sex does not conform with

32

the sex they were assigned at birth, as listed on their original birth certificates. *See* Compl. ¶¶ 63, 75, 94 (A-0029, A-0032, A-0035).

The Complaint adequately alleges facts showing that S.B. 615 and Defendants' Policies violate the Equal Protection Clause. The Students adequately allege that S.B. 615 and Defendants' Policies constitute discrimination on the basis of sex and transgender status, both of which require application of heightened scrutiny. The Students also adequately allege that there is no persuasive justification for the discrimination and that the safety and privacy rationales offered for the policies are unfounded and pretextual.

The district court disregarded its obligation to accept the plausible allegations of the Complaint as true on motions to dismiss. Instead, the court mischaracterized the Students' allegations of discrimination, relied on its own conception of sex, and ignored the Students' allegations that the claimed justifications for the policies were unfounded and pretextual. The district court also failed to acknowledge or grapple with the fact that its conclusions are contrary to the weight of decisions by other federal courts that have considered similar restrictions on transgender students' use of restrooms consistent with their gender identity.

The district court erred fundamentally in failing to treat the Students' allegations as true for purposes of the motions to dismiss. The Students are entitled to an opportunity to make their case on their Equal Protection claim.

> **A.** **The Students Plausibly Allege Facts Establishing that S.B. 615 and Defendants' Policies Discriminate Against the Students on the Basis of Sex, Calling for Heightened Scrutiny.**

The Students allege that S.B. 615 and Defendants' Policies prevent them from using restrooms consistent with their sex because their sex does not conform with the sex they were assigned at birth, as listed on their original birth certificates. *See* Compl. ¶¶ 63, 75, 94 (A-0029, A-0032, A-0035). Boys like Andrew and Mark are forbidden from using the boys' restroom, and girls like Sarah are forbidden from using the girls' restroom because of the sex they were assigned at birth. But students whose sex conforms with the sex listed on their original birth certificates are allowed to use restrooms consistent with their sex. *See id*. ¶¶ 54, 58, 131 (A-0027–29, A-0044). The Students plausibly allege that this difference in treatment constitutes discrimination on the basis of sex, warranting heightened scrutiny of S.B. 615 and Defendants' Policies. *See*

*Rocky Mountain*, 99 F.4th at 1260 (describing heightened scrutiny applied to sex-based discrimination).

The Students' allegations further describe the significant extent of the discriminatory treatment required by S.B. 615 and Defendants' Policies and the substantial harm they cause to the Students. S.B. 615 and Defendants' Policies force the Students into an untenable dilemma: they must either use restrooms that are *inconsistent* with their sex, their appearance, and their day-to-day lives as boys or girls, use inconvenient and stigmatizing single occupancy restrooms that no other students are required to use, or avoid using restrooms at school altogether. If any of the Students continue to use the restrooms consistent with their sex—as they did prior to the implementation of S.B. 615—they risk disciplinary action. *E.g.*, Compl. ¶¶ 58, 69, 89, 101, 106 (A-0029, A-0031, A-0035, A-0037, A-0038). These indignities are not mere inconveniences: the differential treatment required by S.B. 615 and Defendants' Policies singles out Andrew, Mark, and Sarah, humiliating them and inflicting significant emotional harm. *Id.* ¶¶ 2, 71, 103–04, 107–08 (A-0011–12, A-0031, A-0038–39). And using single occupancy restrooms that no other students are required to use is not an effective alternative because, in

addition to being stigmatizing, doing so puts Andrew, Mark, and Sarah at risk of being outed as transgender to their classmates and teachers. *See id.* ¶¶ 43, 87, 104–06 (A-0024–25, A-0034, A-0038).

Recognizing this intolerable situation, numerous courts of appeal and district courts have held that excluding transgender students from multiple occupancy school restrooms consistent with their gender violates or is likely to violate the Equal Protection Clause.[6]

The district court below recognized that S.B. 615 and Defendants' Policies discriminate on the basis of sex, concluding that "S.B. 615 separates individuals based on their biological sex and requires them to use the facilities that correspond to that sex. Thus, the statute classifies individuals based on sex." A-0250. But the district court misstated the facts the Students alleged and drew incorrect conclusions based on this

---

[6] *See, e.g., A.C. by M.C. v. Met. Sch. Dist. of Martinsville*, 75 F.4th 760, 771–74 (7th Cir. 2023); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607–16 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050–55 (7th Cir. 2017); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 220–22 (6th Cir. 2016); *Doe v. Ladapo*, 2024 WL 2947123, at *14 (N.D. Fla. June 11, 2024); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937–38 (S.D. Ohio 2020); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 841 (S.D. Ind. 2019); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016).

misstatement. The term "biological sex" appears nowhere in the Complaint or in S.B. 615; rather, it is a term the State Defendants invented in their motion to dismiss. A-0163 & n.3. The Students *do not* allege that S.B. 615 and Defendants' Policies fail to separate students on the basis of their "biological sex." Instead, they allege that S.B. 615 relies on a definition of the term "sex" as "the physical condition of being male or female based on genetics and physiology, as identified on the individual's original birth certificate," Compl. ¶ 3 (A-0012), and that this one-dimensional definition conflicts with the scientific understanding of sex, *e.g.*, *id.* ¶¶ 24–25 (A-0019). The Students allege that S.B. 615's original birth certificate policy ignores the most important biological factor of an individual's sex: one's gender identity. *Id.* ¶ 25 (A-0019) (emphasizing that "medical consensus" establishes "there is a significant *biologic* component underlying gender identity" (emphasis added)).

The Students each also made specific allegations regarding their own sex, which for each of them does not align with the sex designated on their original birth certificates. *Id.* ¶¶ 60, 72, 91 (A-0029, A-0031, A-0035). Although the district court was obligated to accept these allegations on motions to dismiss, it disregarded them in favor of its own

conception of sex. *Cf. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522–24 (3d Cir. 2018) (relying on expert testimony after recognizing that "such seemingly familiar terms as 'sex' and 'gender' can be misleading in the context" of litigation concerning the use of restrooms and locker room by transgender students); *Grimm*, 972 F.3d at 594 (acknowledging that "many of us carry heavy baggage into any discussion of gender and sex" and relying on amici and expert evidence to "unload[] that baggage and develop[] a fact-based understanding of what it means to be transgender, along with the implications of gendered-bathroom usage for transgender students"). Thus, while the district court rightly found that S.B. 615 and Defendants' Policies discriminate on the basis of sex, even that conclusion was based on the court's departure from the proper standard of review under Fed. R. Civ. P. 12(b)(6)—reliance on its own preconceived notion of sex rather than the facts the Students alleged.

As discussed in Section I.B below, S.B. 615 and Defendants' Policies also discriminate against the Students on the basis of their transgender status. As the Supreme Court and this Court have made clear, such discrimination necessarily constitutes discrimination on the basis of sex because it amounts to "penaliz[ing] a person identified as [a particular

sex] at birth for traits or actions that it tolerates in a [person] identified as [another sex] at birth." *Bostock*, 590 U.S. at 660 (finding that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex"); *Fowler*, 104 F.4th at 788–94, 797 (applying *Bostock* and finding that plaintiffs "plausibly alleged" birth certificate policy "purposefully discriminates on the basis of sex" in violation of the Equal Protection Clause). Thus, the Students adequately alleged that S.B. 615 and Defendants' Policies discriminate against them on the basis of sex.

**B.    The Students Plausibly Allege Facts Establishing that S.B. 615 and Defendants' Policies Discriminate Against the Students on the Basis of Transgender Status, Calling for Heightened Scrutiny.**

The Students also allege facts that plausibly establish S.B. 615 and Defendants' Policies discriminate against the Students on the basis of transgender status and must be reviewed under heightened scrutiny. The Students' allegations are direct:  S.B. 615 and Defendants' Policies target transgender students.  Compl. ¶¶ 2, 52–53, 57–58, 133 (A-0011–12, A-0027–29, A-0045).  These allegations are also specific, stating that S.B. 615 and Defendants' Policies restrict the ability of a boy like Andrew to use the boys' restroom at school—something he regularly did in the

past—because he is transgender, whereas boys who are not transgender are not so restricted.  Compl. ¶¶ 54, 58, 68, 131 (A-0027–31, A-0044).

Despite these allegations, the district court asserted that S.B. 615 "facially classifies based on biological sex—not transgender status or gender identity."  A-0250 & n.5 (citing *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc)).  But this Court has made clear that a statute need not expressly reference the group it discriminates against in order to discriminate against members of that group.[7]  *E.g.*, *Fowler*, 104 F.4th at 784–85 ("[A]t minimum, Plaintiffs have alleged facts from which we may reasonably infer purposeful discrimination on the basis of transgender status.").  While S.B. 615 and Defendants' Policies apply to transgender and cisgender students alike, they uniquely harm the Students on the basis

---

[7]*See Fowler*, 104 F.4th at 792 ("[W]e are unpersuaded by the argument that [the policy at issue] is not sex-based discrimination if it applies equally to all sexes."); *see also Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) (restricting marriage to different-sex couples discriminates based on sexual orientation even though heterosexuals were equally constrained from marrying someone of the same sex); *United States v. Virginia*, 518 U.S. 515, 542 (1996) (men's college discriminates based on sex even though "many men would not want to be educated" there); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").  A law must be evaluated by those it harms, not those it does not affect.  *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) ("The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.").

of their transgender status because only transgender students are prevented from using restrooms consistent with their sex. The Students' allegations thus support a plausible claim that S.B. 615 and Defendants' Policies discriminate against them based on their transgender status.

Having found that S.B. 615 and Defendants' Policies discriminate on the basis of sex, the district court concluded that it need not decide whether they also discriminate on the basis of transgender status. A-0250 & n.5. This was a mistake.

The Students' two Equal Protection claims must be analyzed independently. Under the first prong of an Equal Protection analysis, the court determines the basis of discrimination and whether heightened scrutiny is warranted for that discrimination. Under the second prong, if heightened scrutiny is required, the court considers whether defendants have established an "exceedingly persuasive justification" for that discrimination. Here, the district court determined that S.B. 615 discriminates on the basis of sex and then discussed sex stereotypes in the second prong of its analysis. A-0252 (citing *Etsitty*, 502 F.3d 1215). But a justification relating to sex stereotypes applies only to discrimination on the basis of sex, not discrimination on the basis of

transgender status.  Like sex or race, "[t]ransgender status [itself] is rarely an appropriate basis on which to parcel out government benefits or burdens." *Ladapo*, 2024 WL 2947123, at *14.  If plaintiffs allege that a policy discriminates on the basis of transgender status—as the Students have here—and such discrimination is subject to heightened scrutiny, there must be an exceedingly persuasive justification for discrimination on *that* basis.  Justifications for discrimination on other purported bases, like those referencing sex stereotypes, are insufficient.

Discrimination on the basis of transgender status is subject to heightened scrutiny.  Courts examine four factors to assess whether some form of heightened scrutiny applies:  (1) whether the group discriminated against has been historically "subjected to discrimination," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); (2) whether the group discriminated against has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985); (3) whether the group discriminated against exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) whether the group discriminated against is "a minority or

politically powerless," *id.*, though "immutability and lack of political power are not strictly necessary factors" for heighted scrutiny to apply. *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013).

Here, all four factors support heightened scrutiny. Numerous federal courts have applied these factors to recognize that transgender people constitute at least a quasi-suspect class. *E.g.*, *Grimm*, 972 F.3d at 611 (finding "[e]ach factor . . . readily satisfied" with regard to transgender people); *accord Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019); *Ladapo*, 2024 WL 2947123, at *14. "[T]ransgender people have suffered a history of persecution and discrimination" and "are a politically powerless minority," and "transgender status bears no relation to ability to contribute to society" and "is a sufficiently discernible characteristic to define a discrete minority class." *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 139–40 (S.D.N.Y. 2015). Transgender people have experienced a long history of discrimination, including pervasive discrimination in employment, housing, and access to places of public accommodation or government services. *Id.* at 139; *see also Highland*, 208 F. Supp. 3d at 873–74; *Brocksmith v. United States*, 99 A.3d 690, 698

n.8 (D.C. 2014). Additionally, "there is obviously no relationship between transgender status and the ability to contribute to society." *Highland*, 208 F. Supp. 3d at 874.

Transgender individuals are also a discrete minority—it is estimated that only 0.39% of the adults in the United States identify as transgender, and there can be little dispute that they are relatively powerless politically. *See* Esther L. Meerwijk & Jae M. Sevelius, *Transgender Population Size in the United States: A Meta-Regression of Population-Based Probability Samples*, 107(2) Am. J. Pub. Health (Feb. 2017). Further, a person's gender identity is an innate, effectively immutable characteristic which cannot be altered, Compl. ¶ 25 (A-0019), and which the Government cannot require be changed in order to obtain equal treatment. *Highland*, 208 F. Supp. 3d at 874; *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000); *see also Windsor*, 699 F.3d at 183 (observing that "a trait [is] effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity"). Accordingly, Defendants' discrimination based on transgender status must be evaluated under heightened scrutiny.

C. **The Students Plausibly Allege Facts Showing that S.B. 615 and Defendants' Policies Have No Exceedingly Persuasive Justification and Therefore Cannot Survive Heightened Scrutiny.**

Defending discrimination subject to heightened scrutiny is a tall order. The Government "must provide a justification for the sex-based classification that is 'exceedingly persuasive,' and that classification must serve 'important governmental objectives' through means 'substantially related to' achieving those objectives." *Rocky Mountain*, 99 F.4th at 1260. The burden is on "the defender of legislation that differentiates on the basis of gender [to] show" the legislation's justification. *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017). This standard is "stringent," *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 799 (10th Cir. 2019), particularly on a motion to dismiss. *E.g.*, *Rocky Mountain*, 99 F.4th at 1261 ("the Complaint does not establish that [the defendant] has an 'exceedingly persuasive justification' for its sex-based classification . . . [and] at the 12(b)(6) stage, [the defendant] never had the opportunity to make such a showing").

Before the district court, the Students plausibly alleged facts showing that the sole justification offered for S.B. 615—a single, unelaborated reference to "privacy and safety"—is neither a genuine nor

an exceedingly persuasive justification, but instead an empty attempt to generate some rationale for a suspect law. *See, e.g.*, Compl. ¶¶ 45–47, 52, 68, 80, 82, 97, 100, 134 (A-0025–27, A-0030–31, A-0033, A-0036–37, A-0045–46). The Students allege that the "purported 'privacy' and 'safety' concerns" referenced in S.B. 615 "are unfounded pretext to target students who are transgender" and that "[s]tudents who are transgender pose no risks to the privacy or safety of other students, whether in using multiple occupancy facilities or in any other context." *Id*. ¶ 52 (A-0027). At the motion to dismiss stage, S.B. 615's bare "privacy and safety" rationale provides insufficient grounds to ignore the Students' allegations and dismiss the Complaint. *See Fowler*, 104 F.4th at 796 (rejecting the claim that Oklahoma's policy prohibiting the modification of birth certificates helps "avoid fraud" where "the State Amici d[id] not offer more information, so it is unclear what type of fraud the [p]olicy supposedly prevents").

The Students are entitled to prove their allegations that the purported purpose of S.B. 615 is pretextual and to make the sorts of showings other federal courts have allowed in similar cases and later found persuasive. *See supra* at p.36 n.6. Among other things, the

Students allege procedural irregularity—that S.B. 615 originated as a bill concerning sex education curriculum, but shortly before passage was entirely re-written to instead require that transgender students be excluded from school restrooms and changing areas their peers may use because of the sex assigned on their original birth certificates.  Compl. ¶ 49 (A-0026); *cf. Fowler*, 104 F.4th at 784 (acknowledging that "the historical background of the decision, the specific sequence of events leading up to the challenged decision, and departures from the normal procedural sequence" demonstrate discrimination) (cleaned up).

Defendants did not and cannot identify in the Complaint any evidence of privacy or safety offenses, any evidence suggesting that transgender people have a predisposition toward such offenses, nor even a single incident of such offense in Oklahoma or elsewhere.  Instead, upon passage of S.B. 615, the bill's sponsor made statements having nothing to do with safety or privacy—that S.B. 615 was aimed at "removing all forms of indoctrination" and lamenting "how far we slipped in our society" because he thought "we are willing to fail our kids by coercing them into living in someone else's fantasy."  Compl. ¶ 53 (A-0027).  This reference to the existence of transgender people as a "fantasy" and "indoctrination"

has nothing to do with safety or privacy.  *Cf. Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1268 (10th Cir. 2008) (considering statements by the sponsor of legislation when refusing to uphold a statute that "abridges an enumerated constitutional right on the basis of a factitious governmental interest found nowhere but in the defendants' litigating papers"); *Fowler*, 104 F.4th at 784 (plaintiff "need allege only that the state actor chose a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *Ladapo*, 2024 WL 2947123, at *17 (finding discriminatory animus where a legislator referred to transgender people as "mutants" and "demons," and observing that the public nature of this statement showed "at least some other legislators would share his view" and that no other legislators "called him out").

While the safety and privacy of students are legitimate interests, at this early stage of the proceedings, the district court was bound to treat as true the Students' plausible allegations that the reference to those interests was unfounded and pretextual.  The Students plausibly allege that allowing transgender students to enter a multiple occupancy restroom, go into a stall to relieve themselves behind a closed door, wash

their hands, and leave poses no risk to anyone's safety or privacy. *E.g.*, Compl. ¶¶ 68, 82 (A-0030–31, A-0033); *cf. Whitaker*, 858 F.3d at 1052. Defendants did not and could not conclusively establish at this early stage that S.B. 615 and Defendants' conduct enforcing it actually further safety or privacy in a substantial and direct way. *See Virginia*, 518 U.S. at 533 (on intermediate scrutiny, "[t]he justification must be genuine, not hypothesized, or invented *post hoc* in response to litigation"); *Rocky Mountain*, 99 F.4th at 1261 (under intermediate scrutiny, "the Complaint does not establish that [the defendant] has an 'exceedingly persuasive justification'" and "at the 12(b)(6) stage, [the defendant] never had the opportunity to make such a showing"). "[M]ere recitation of a benign [or] compensatory purpose" does not block "inquiry into the actual purposes" of government-maintained gender-based classifications. *Virginia*, 518 U.S. at 535–36; *Califano v. Goldfarb*, 430 U.S. 199, 212–13 (1977) (rejecting government-proffered purposes after inquiry into the actual purposes).

The lack of contemporaneous support for S.B. 615's pretextual privacy and safety references not only confirms the Students' allegations of pretext; it shows that, while "supposedly based on 'reasonable

considerations,'" S.B. 615 "in fact reflect[s] 'archaic and overbroad generalizations about gender,'" which cannot survive scrutiny. *Fort Collins*, 916 F.3d 792 at 799, 802 ("as we inquire into a gender-based classification's objectives, we must beware of stereotypes and their potential to perpetuate inequity").

Rather than accepting the Students' allegations, as it was bound to do on motions to dismiss, the district court made no reference to the allegations concerning S.B. 615's pretextual objective or the suspect circumstances of S.B. 615's passage. The district court also failed to consider or distinguish the multitude of federal court decisions that reject purported privacy and safety justifications for excluding transgender individuals from multiple occupancy restrooms as unfounded and unpersuasive. *See, e.g.*, *Grimm*, 972 F.3d at 613–15 (holding that school policy similar to S.B. 615 was not substantially related to important government interests in protecting privacy and instead was "marked by misconception and prejudice" against transgender student).[8]

---

[8] *See also, e.g.*, *Parents for Privacy v. Barr*, 949 F.3d 1210, 1226 (9th Cir. 2020) (affirming dismissal of privacy claims of cisgender students opposed to school district's plan to allow transgender male student to use boys' restroom at school); *Boyertown*, 897 F.3d at 527–33 (affirming denial of preliminary injunction sought by cisgender students who (continued…)

Instead, the district court limited itself to once again applying its mistaken premise that S.B. 615 segregates restrooms on the basis of "biological sex." The court thought that the text of S.B. 615 shows the bill is meant to ensure students' "privacy and safety from the opposite sex" by "[s]eparating students based off biological sex." A-0251. But S.B. 615 does not do this. *See supra* at pp.36–38. S.B. 615 separates students based on original birth certificates which, as alleged in the Complaint, do not correspond to the Students or other transgender students' sex, which is determined by their gender identity and its biological correlates. *See supra* at p.37.

On motions to dismiss, the district court could not determine from the allegations in the Complaint that S.B. 615 and Defendants' Policies

---

objected to sharing restrooms with transgender students on privacy grounds); *Whitaker*, 858 F.3d at 1052 (granting preliminary injunction against enforcement of school policy similar to S.B. 615 as likely violating Equal Protection Clause and concluding that "the School District's privacy argument [wa]s based upon sheer conjecture and abstraction"); *A.H. ex rel. Handling v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 578 (M.D. Pa. 2019) (granting partial summary judgment that school district's prohibition on transgender girl using female restrooms on school field trips violated Equal Protection Clause because district "failed to demonstrate an exceedingly persuasive justification for its field-trip policy"); *Evancho*, 237 F. Supp. 3d at 294–95 (granting preliminary injunction on transgender students' Equal Protection claim that they should not be excluded from restroom consistent with their gender identity and stating that doing so would be unlikely to cause harm, including to any privacy interests).

actually further safety and privacy interests in a substantial and direct way, and the Students had no opportunity to argue that any evidence Defendants might proffer fails to meet Defendants' burden of proof. *See Rocky Mountain*, 99 F.4th at 1261 ("[a]t the 12(b)(6) stage, [defendant] never had the opportunity" to establish an "'exceedingly persuasive justification' for its sex-based classification"); *see id.* (recognizing that "this issue was not sufficiently developed such that a court could resolve it in favor of RMCA on a 12(b)(6) motion"). Accordingly, viewing the Students' Complaint through the "proper lens" of intermediate scrutiny at the Rule 12(b)(6) stage, *id.*, the Students have adequately stated an Equal Protection claim.

### D. *Etsitty* Does Not Justify S.B. 615's Reliance on Sex Stereotypes.

The district court agreed that "[a]ny law premised on generalizations about the way women are—or the way men are—will fail constitutional scrutiny because it serves no important governmental objective." A-0252 (citing *Fort Collins*, 916 F.3d at 801). But the district court declined to rely on this established principle to conclude that S.B. 615 was premised on such generalizations. Instead, the court asserted that "determining what is (and is not) an important

52

governmental objective is a legal question," A-0251, and that binding precedent held the "[u]se of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes," A-0252 (citing *Etsitty*, 502 F.3d at 1224).

The district court was mistaken. *First*, evaluation of S.B. 615's pretextual justification involves questions of fact, which cannot be resolved on a motion to dismiss. As described above, the Students allege that the purported privacy and safety concerns identified in S.B. 615 are an "unfounded pretext to target students who are transgender." Compl. ¶ 52 (A-0027). So even if "determining what is (and is not) an important governmental objective is a legal question," the actual existence of such an objective in a particular case involves questions of fact and is contested here. *Cf. Virginia*, 518 U.S. at 535–36 ("[B]enign justifications proffered in defense of categorical exclusions will not be accepted automatically."). The weight of federal court precedent rejects privacy and safety justifications for excluding transgender individuals from multiple occupancy restrooms, and several of these decisions included findings based on detailed factual records. *See supra* at p.50 & n.8.

Even *Etsitty* itself emphasized that justifications for discrimination require determinations of fact. The court affirmed summary judgment only on "the record and arguments before [the] court." *Etsitty*, 502 F.3d at 1222 (further observing "[s]cientific research may someday cause a shift in the plain meaning of the term 'sex' so that it extends beyond the two starkly defined categories of male and female"). Here, each of the Students allege their sex with reference to medical and biological facts and allege that safety and privacy are unfounded and pretextual rationales in this instance. They are entitled to develop a factual record in support of these allegations.[9]

*Second*, even if *Etsitty* were once binding precedent as to whether restrictions on transgender students' use of restrooms are grounded in sex stereotypes, it is no longer good law because, as this Court recently recognized in *Fowler*, *Etsitty*'s holdings and rationales are undermined by *Bostock*. This Court held that there is no reason to "prevent *Bostock*'s commonsense reasoning—based on the inextricable relationship between

---

[9] In a further misstep, the district court applied *Etsitty* to determine whether discrimination under a policy was justified, but *Etsitty*'s finding concerned whether discrimination even existed. *See Etsitty*, 502 F.3d at 1225 (the employer's "proffered reason of concern over restroom usage is not discriminatory on the basis of sex").

transgender status and sex—from applying to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context." *Fowler*, 104 F.4th at 790.  *Bostock*'s conclusion was simple and contrary to *Etsitty*.  *Compare Bostock*, 590 U.S. at 660 ("it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex"), *with Etsitty*, 502 F.3d at 1222 ("discrimination against a transsexual because she is a transsexual is not discrimination because of sex") (cleaned up).  The Supreme Court and the Tenth Circuit have applied the rationale of *Bostock* broadly.[10]  Accordingly, *Bostock, Fowler*, and *Etsitty* itself make clear that *Etsitty*'s non-binding factual findings do not require dismissal of the Students' claims on the pleadings.

## II.    THE STUDENTS ADEQUATELY STATE A TITLE IX CLAIM.

The Students also adequately alleged that S.B. 615 violates Title IX by discriminating against transgender students on the basis of sex.

---

[10] *E.g.*, *Murray v. UBS Sec., LLC*, 601 U.S. 23, 24 (2024) (applying *Bostock*'s determination of "discriminate" to retaliatory firing under the Sarbanes-Oxley Act); *U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) ("[I]t is unclear why PMI believes that using an example from *Bostock* is impermissible.  The district court did not abuse its discretion by applying the traditional but-for causation test [as articulated by *Bostock*] to a similarly worded employment retaliation provision.").

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  To state a claim under Title IX, the Students had to allege (1) discrimination in an educational program "on the basis of sex"; (2) that the program receives Federal financial assistance; and (3) the exclusion from use of restrooms consistent with their gender identity harmed the Students.  *See Grimm*, 972 F.3d at 616.  The Complaint contained sufficient factual allegations to satisfy all these elements and to provide the basis for a reasonable inference that the Oklahoma State Department of Education ("OSDE") and the School District Defendants are liable for discrimination on the basis of sex in violation of Title IX.

> **A.    The Students Plausibly Allege Facts Showing that S.B. 615 and the School District Defendants' Policies Constitute Discrimination on the Basis of Sex.**

The Students adequately allege facts to satisfy all three prongs of a Title IX claim.  *First*, the Students, as transgender students, experience sex-based discrimination as a result of S.B. 615.  Andrew and Mark are both boys who live their day-to-day lives as boys.  Compl. ¶¶ 60, 72, 67–

56

68, 80–82 (A-0029–31, A-0033). But S.B. 615 treats them differently than cisgender boys because it prevents transgender boys like Andrew and Mark—but not cisgender boys—from using the boys' multiple occupancy restrooms at school based solely on the sex they were assigned at birth. *Id.* ¶¶ 2–5, 28, 47, 69, 85, 88, 143 (A-0011–13, A-0020, A-0026, A-0031, A-0034–35, A-0047). Sarah is a girl who lives her day-to-day life as a girl. *Id.* ¶¶ 91, 95, 99–100 (A-0035–37). But S.B. 615 treats transgender girls like Sarah differently than cisgender girls in the same way: by prohibiting transgender girls from using the girls' multiple occupancy restrooms at school based on the sex they were assigned at birth. *Id.* ¶¶ 2–5, 28, 47, 101, 107, 143 (A-0011–13, A-0020, A-0026, A-0037–39, A-0047).

This differential treatment constitutes discrimination "on the basis of sex." In *Bostock*, the Supreme Court applied "the 'simple' and 'traditional' standard of but-for causation" to show that transgender status is "inextricably bound up with sex." *Bostock*, 590 U.S. at 656, 660–61. In short, "sex is necessarily a but-for cause," and discrimination against transgender people "inescapably *intends* to rely on sex in its

decisionmaking." *Id.* at 661. "So long as the plaintiff's sex was one but-for cause . . . that is enough to trigger the law." *Id.* at 656.

The district court noted that *Bostock* concerned Title VII, not Title IX, but this Court recently rejected the argument that *Bostock* applies only to Title VII. *Fowler*, 104 F.4th at 788. More specifically, the Supreme Court and the Tenth Circuit have "looked to [their] Title VII interpretations of discrimination in illuminating Title IX." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617 n.1 (1999); *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims.").[11]

As the Tenth Court recently concluded in *Fowler*, "[*Bostock*] did not indicate that its logic concerning the intertwined nature of transgender status and sex was confined to Title VII," and "[t]he Court's focus on Title

---

[11] *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), cited by the district court below, A-0255, does not suggest otherwise. *Jackson* addressed whether the private right of action implied by Title IX encompasses retaliation claims arising out of complaints about sex discrimination. *Jackson*, 544 U.S. at 171. While the Court observed that "Title VII . . . is a vastly different statute from Title IX," this was in the context of noting that Title VII has an express retaliation right of action, whereas Title IX does not. *Id.* at 175. Ultimately, after observing that its "repeated holdings constru[e] 'discrimination' under Title IX broadly," the Court concluded that Title IX encompasses retaliation claims. *See id.* at 174, 183.

VII and the issue before it suggest[ed] a proper exercise of judicial restraint, not a silent directive that its reasoning about the link between . . . transgender status and sex was restricted to Title VII." *Fowler*, 104 F.4th at 790.    The fact that *Bostock* did not opine on legislation concerning restrooms and locker rooms likewise reflects only that such legislation was not before the Court at that time.    *Bostock*, 590 U.S. at 681; *cf.* A-0243 & n.1, A-0253 & n.7, A-0255.    Federal courts have had no difficulty concluding that *Bostock*'s reasoning applies fully to transgender students' access to restrooms consistent with their gender identity.    *See, e.g.*, *Grimm*, 972 F.3d at 616 ("After the Supreme Court's recent decision in *Bostock* . . . we have little difficulty holding that a bathroom policy precluding Grimm from using the boys restrooms discriminated against him 'on the basis of sex.'    Although *Bostock* interprets Title VII . . . it guides our evaluation of claims under Title IX."); *Martinsville*, 75 F.4th at 769 (similar).

*Second*, the Students allege facts supporting the second and third elements of a Title IX claim.    OSDE and the School District Defendants receive Federal financial assistance.    Compl. ¶¶ 5, 19–22, 139–40 (A-0013, A-0017–18, A-0047).    And the Complaint alleges that S.B. 615,

as enforced by the School District Defendants, harms the Students. *Id.* ¶¶ 2, 43–44, 69–71, 86–89, 103–08 (A-0011–12, A-0024–25, A-0031, A-0034–35, A-0038–39). Thus, the Students adequately allege Title IX claims, and the district court erred in dismissing those claims. *See, e.g.*, *Grimm*, 972 F.3d at 616–19; *Whitaker*, 858 F.3d at 1049–50; *Dodds*, 845 F.3d at 220–22.

## B.   The District Court Erred in Relying on 20 U.S.C. § 1686 and 34 C.F.R. § 106.33 To Dismiss the Title IX Claim.

The Students do not object to restrooms separated by sex in schools. Rather, they bring their claims because they are denied access to the restroom appropriate to their sex. All the Students ask is that boys— both transgender and cisgender—be able to use restrooms designated for boys, and that both transgender girls and cisgender girls be able to access restrooms designated for girls. To deny such access, as S.B. 615 and Defendants' Policies do, is to discriminate on the basis of sex.

Rather than address this critical question, the district court focused on a section of Title IX, 20 U.S.C. § 1686, which states that "[n]otwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate

60

living facilities for the different sexes," and a regulation, 34 C.F.R.
§ 106.33, which states that "[a] recipient may provide separate toilet,
locker room, and shower facilities on the basis of sex, but such facilities
provided for students of one sex shall be comparable to such facilities
provided for students of the other sex." The district court concluded that,
based on the language of Section 1686, S.B. 615 does not violate Title IX
so long as "sex" under Title IX means "biological sex." A-0257 ("[I]f the
term 'different sexes' is referring to different *biological sex*, then
Oklahoma's law is perfectly in sync with Title IX."). The court then cited
the purported "ordinary public meaning" of "sex" "at the time Title IX
was enacted" to conclude that S.B. 615 "falls into one of the statute's
narrow exceptions allowing schools to require that the different biological
sexes use different living facilities such as restrooms." A-0258. The
district court's reading of 20 U.S.C. § 1686 was mistaken for several
reasons.

*First*, Title IX does not indicate that Congress intended for
Section 1686 to undercut the basic prohibition on discrimination

described in Section 1681.[12]    Unlike the statutory exemptions in 20 U.S.C. § 1681(a)(2)–(9), where the broad prohibition on sex discrimination "shall not apply," Section 1686 states only that "nothing contained herein shall be construed to prohibit any education institution . . . from maintaining separate living facilities for the different sexes." Section 1686 and the regulation the district court cited cannot override Section 1681's statutory prohibition on "discrimination," but instead must be read consistently with the broader prohibition. *See Grimm*, 972 F.3d at 618 ("[T]he implementing regulation cannot override the statutory prohibition against discrimination on the basis of sex.  All [34 C.F.R. § 106.33] suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to [transgender students], the Board may rely on its own discriminatory notions of what 'sex' means.").  Though Title IX funding recipients may provide separate restrooms for boys and girls,

_____

[12] Section 1686 is not an exception to Section 1681.  The exceptions are specifically listed in Section 1681(a).  In *Jackson*, the Supreme Court stated that "Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition.  *See* 20 U.S.C. § 1681." *Jackson*, 544 U.S. at 175.  Notably, the Court did not cite other sections beyond Section 1681 for its proposition.

they are not entitled to define "sex" or "boys" and "girls" in a way that discriminates against transgender students or excludes them in a harmful way. *See Burlington N. & S.F.R Co. v. White*, 548 U.S. 53, 59 (2006) ("the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals").

*Second*, the district court's conception of "biological sex" was misguided. Title IX does not define "sex," and there is no indication that "for the different sexes" refers to "physiological/reproductive sex" or that "biological sex" excludes gender identity. Contrary to the district court's view, dictionary definitions do not clearly support the view that "sex" means only "biological sex" or "physiological sex." *See Martinsville*, 75 F.4th at 770 (stating that dictionary definitions of "sex" from around 1972 are inconclusive and there is insufficient evidence to support the assumption that "sex" can mean only "biological sex"). The Students allege that a person's "gender identity is the most important and determinative factor" in establishing their sex, Compl. ¶ 24 (A-0019), and they are entitled to present further evidence to support this allegation.

*Third*, the Department of Education's Title IX regulations set to take effect on August 1 confirm that the carve-out for "living facilities"

described in Section 1686 does not permit recipients to discriminate against transgender students by denying them access to restrooms consistent with a student's gender identity. *See, e.g.*, 34 C.F.R. §§ 106.10, 106.31(2). Moreover, in issuing the regulations, the Department of Education expressly explained that the term "living facilities" under Section 1686 refers to housing (*e.g.*, dormitories), not to restrooms. [13]

\*      \*      \*

Particularly in light of the reasoning in *Bostock* and *Fowler*, the Students adequately alleged that S.B. 615 and Defendants' Policies deny the Students the ability to use restrooms consistent with their gender identity, and, in so doing, discriminate against them on the basis of sex and their transgender status in violation of the Equal Protection Clause and Title IX. The district court's dismissal of the Students' Complaint cannot stand.

---

[13] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33821 (Apr. 29, 2024). In support of its conclusion that Section 1686 does not apply to restrooms, the Department of Education points out that its predecessor agency, the Department of Health, Education, and Welfare, cited Section 1686 as "one of the sources of its statutory authority for the housing provision [45 C.F.R. 86.32], whereas it cited only [§§ 1681–82] as its statutory authority for the provision governing toilet, locker room, and shower facilities [45 C.F.R. 86.33], and the Department of Education retained those authorities when it adopted its own Title IX regulations in 1980." *Id.*

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs-Appellants respectfully ask the

Court to reverse the district court's dismissal of their Complaint.

Dated this 12th day of July, 2024.

Respectfully submitted,

*/s/ Isaac D. Chaput*
Isaac D. Chaput

| | |
|---|---|
| Megan Lambert (OBA 33216) | Isaac D. Chaput |
| Devraat Awasthi (OBA 35544) | COVINGTON & BURLING LLP |
| AMERICAN CIVIL LIBERTIES UNION OF | Salesforce Tower |
| OKLAHOMA FOUNDATION | 415 Mission Street, Suite 5400 |
| P.O. Box 13327 | San Francisco, CA 94105 |
| Oklahoma City, OK 73113 | (415) 591-6000 |
| (405) 525-3831 | ichaput@cov.com |
| mlambert@acluok.org | |
| dawasthi@acluok.org | Robert C. Gianchetti |
| | COVINGTON & BURLING LLP |
| Jon W. Davidson | The New York Times Building |
| (admitted only in California) | 620 Eighth Avenue |
| Harper S. Seldin | New York, NY 10018 |
| (admitted only in Pennsylvania) | (212) 841-1000 |
| AMERICAN CIVIL LIBERTIES | rgianchetti@cov.com |
| UNION FOUNDATION | |
| 125 Broad Street, 18th Floor | Paul D. Castillo |
| New York, NY 10004 | LAMBDA LEGAL DEFENSE AND |
| (323) 536-9880 | EDUCATION FUND, INC. |
| jondavidson@aclu.org | 3500 Oak Lawn Ave., Ste. 500 |
| hseldin@aclu.org | Dallas, TX 75219 |
| | (214) 219-8585 |
| | pcastillo@lambdalegal.org |

65

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This Brief complies with type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because it contains 12,909 words, excluding the parts of the Brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2.    This Brief complies with the typeface and type style requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Isaac D. Chaput*
Isaac D. Chaput

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs-Appellants respectfully request that oral argument be granted in this appeal.  This case involves an important question of alleged discrimination against transgender students through exclusion of transgender students from public-school multiple-user restrooms that other students of their sex are allowed to use, and disposition of this appeal will impact others beyond the parties, including other transgender youth in Oklahoma and their parents or guardians.  The lower court's reasoning implicates the interpretation and significance of previous Tenth Circuit decisions—*Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024), and *Etsitty v. Utah Transit Authority*, 502 F.3d 1215 (10th Cir. 2007)—and the outcome in the district court is against the authority of this Circuit and the overwhelming weight of authority from other courts across the nation.

*/s/ Isaac D. Chaput*
Isaac D. Chaput

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2024, I electronically filed the foregoing document through the Court's electronic filing system, and that it has been served on all counsel of record through the Court's electronic filing system.

*/s/ Isaac D. Chaput*
Isaac D. Chaput

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing:

1.    All required privacy redactions have been made per 10th Cir. R. 25.5.

2.    If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

3.    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR Advanced Endpoint Protection, last updated on July 12, 2024, and according to the program are free of viruses.

*/s/ Isaac D. Chaput*
Isaac D. Chaput

## <u>10TH CIR. R. 28.2(A) ATTACHMENTS</u>

**I.   Order Granting State Defendants' Motion to Dismiss (W.D. Okla. Jan. 12, 2024), ECF No. 107**

**II.   Order Granting School District Defendants' Motion for Judgment on the Pleadings (W.D. Okla. Mar. 22, 2024), ECF No. 117**

**III.   Final Judgment (W.D. Okla. Mar. 22, 2024), ECF No. 118**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ELI BRIDGE, on behalf of Andrew Bridge, a minor, by his next friends and parents, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-22-00787-JD |
| OKLAHOMA STATE DEPARTMENT OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

## **ORDER**

"Physical differences between men and women . . . are enduring" and the "'two sexes are not fungible . . . .'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)). In fact, "sex, like race and national origin, is an immutable characteristic . . . ." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion). With these principles in mind, the Court tackles a question that has not yet been addressed by the Supreme Court of the United States or the United States Court of Appeals for the Tenth Circuit: whether separating the use of male and female restrooms and changing areas in public schools based on a student's biological sex violates the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, or Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq.[1]

---

[1] In *Bostock v. Clayton County, Georgia*, the Supreme Court held that an employer who fires an individual for being homosexual or transgender unconstitutionally discriminates against that person because of sex under Title VII. However, the Supreme

Before the Court is Andrew Bridge ("Bridge"), Mark Miles ("Miles"), and Sarah

Stiles's ("Stiles") (collectively "Plaintiffs") Motion for Judicial Notice [Doc. No. 25] and

a Motion to Dismiss [Doc. No. 47] filed by the Oklahoma State Department of Education

("OSDE"); Ryan Walters, in his official capacity as the State Superintendent of Public

Instruction; Donald Burdick, Katie Quebedeaux, Zach Archer, Kendra Wesson, Trent

Smith, and Sarah Lepak, all in their official capacities as members of the Oklahoma

Board of Education; and Gentner Drummond, in his official capacity as Oklahoma

Attorney General (collectively "State Defendants"). Independent School District No. 40

of Cleveland County, Oklahoma ("Noble Public Schools"), Independent School District

No. 2 of Cleveland County, Oklahoma ("Moore Public Schools"), Independent School

District No. 89 of Oklahoma County, Oklahoma ("Oklahoma City Public Schools"), and

Harding Independence Charter District, Inc. ("HICD") are also defendants in this case

(collectively "Defendants"). The Motion to Dismiss seeks dismissal of Plaintiffs'

complaint [Doc. No. 1] under Federal Rule of Civil Procedure 12(b)(6) for failure to state

a claim upon which relief can be granted. For the reasons stated below, the Court

GRANTS both motions.

## I.      <u>BACKGROUND</u>

On May 25, 2022, Oklahoma Governor Kevin Stitt signed Senate Bill 615 ("S.B.

615") into law. Okla. Stat. tit. 70 § 1-125. S.B. 615 states:

> To ensure privacy and safety, each public school and public charter school
> that serves students in prekindergarten through twelfth grades in this state

---

Court also made clear that its opinion did "not purport to address bathrooms, locker
rooms, or anything else of the kind." 590 U.S. ----, 140 S. Ct. 1731, 1753 (2020).

2

> shall require every multiple occupancy restroom or changing area
> designated as follows:
>
>> 1. For the exclusive use of the male sex; or
>> 2. For the exclusive use of the female sex.
>
> Each public school or public charter school in this state shall provide a
> reasonable accommodation to any individual who does not wish to comply
> with the provisions of subsection B of this section. A reasonable
> accommodation shall be access to a single occupancy restroom or changing
> room.

*Id.* § 1-125(B)–(C). The law defines "sex" as "the physical condition of being male or

female based on genetics and physiology, as identified on the individual's original birth

certificate." *Id.* § 1-125(A)(1).

> "Multiple occupancy restroom or changing area" means an area in a public
> school or public charter school building designed or designated to be used
> by more than one individual at a time, where individuals may be in various
> stages of undress in the presence of other individuals. The term may
> include but is not limited to a school restroom, locker room, changing
> room, or shower room . . . .

*Id.* § 1-125(A)(2). If a school fails to comply with the statute, "the noncompliant school

district or public charter school shall receive a five percent (5%) decrease in state funding

for the school district or public charter school for the fiscal year following the year of

noncompliance." *Id.* § 1-125(F).

Bridge is a transgender boy. *See* Compl. [Doc. No. 1] ¶ 60. This means Bridge

identifies as male, but that Bridge's biological sex, based on anatomy and genetics, is

female. *Id.* ¶¶ 2, 60. After coming out as transgender in 2020, Bridge began taking steps

to appear more masculine such as getting a shorter haircut and wearing more masculine

clothing. *Id.* ¶¶ 63, 64. Bridge attended Noble High School, which is a public school

operated by Noble Public Schools in Cleveland County, Oklahoma. *Id.* ¶¶ 19, 61.[2]

Bridge used the boys' restroom at school during the 2021–2022 school year before S.B.

615 was passed. Compl. [Doc. No. 1] ¶ 68. Before the 2022–2023 school year began,

school administrators informed Bridge that, moving forward, Bridge was not allowed to

use the boys' restroom. *Id.* ¶ 69.

Miles is a transgender boy. *Id.* ¶ 72. This means Miles identifies as male, but that

Miles's biological sex, based on anatomy and genetics, is female. *Id.* ¶¶ 2, 72. After

beginning to identify as male in 2018, Miles began taking steps to appear more masculine

such as getting a shorter haircut. *Id.* ¶¶ 76–77. Miles attends a public school operated by

Moore Public Schools. *Id.* ¶¶ 20, 73. Miles began using the boys' restroom at school at

the start of the 2021–2022 academic year. *Id.* ¶ 82. In January 2022, the freshman

principal stated that Miles needed to use the single-occupancy restroom or the girls'

restroom. *Id.* ¶ 83. Miles's parents filed a Title IX grievance with the school district but

received a final decision denying relief on June 15, 2022, due to the enactment of S.B.

615. *Id.* ¶ 85.

Stiles is a transgender girl. *Id.* ¶ 91. This means Stiles identifies as female but that

Stiles's biological sex, based on anatomy and genetics, is male. *Id.* ¶¶ 2, 91. Stiles

---

[2] "Two related doctrines, standing and mootness, keep federal courts within their
constitutional bounds. Standing concerns whether a plaintiff's action qualifies as a case
or controversy when it is filed; mootness ensures it remains one at the time a court
renders its decision." *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016). Here,
Bridge has graduated from high school since filing this suit. However, the Court is
satisfied that Bridge has standing to challenge the constitutionality of S.B. 615 and that
Bridge's claim is not moot.

attended Independence Charter Middle School ("ICMS"), which is a public school in

Oklahoma County operated by HICD. *Id.* ¶¶ 21–22, 92. In 2021, Stiles came out as

transgender to Stiles's family. *Id.* ¶ 95. Sue Stiles, Stiles's mother, subsequently met with

the ICMS principal and the HICD superintendent. *Id.* ¶ 99. Both the principal and

superintendent assured that Stiles could use the girls' restroom. *Id.* However, after S.B.

615 was enacted, Stiles was required to use the boys' restroom or single-occupancy

restroom. *Id.* ¶ 101.

On September 6, 2022, Plaintiffs sued Defendants challenging the constitutionality

of S.B. 615 under the Equal Protection Clause of the Fourteenth Amendment, U.S. Const.

amend. XIV, § 1, and Title IX of the Education Amendments Act of 1972, 20 U.S.C.

§ 1681 et seq.[3]

## II.   LEGAL STANDARDS

"Rule 12(b)(6) dismissal 'is appropriate if the complaint alone is legally

insufficient to state a claim.'" *Serna v. Denver Police Dep't*, 58 F.4th 1167, 1169 (10th

Cir. 2023) (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081,

1104–05 (10th Cir. 2017)). In considering a motion to dismiss under Rule 12(b)(6), the

inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is

plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th

---

[3] Plaintiffs bring their equal protection claim against the State Superintendent,
School Board Members, and Oklahoma Attorney General, as well as Noble Public
Schools, Moore Public Schools, and HICD. They bring their Title IX claim against
OSDE, Noble Public Schools, Moore Public Schools, HICD, and Oklahoma City Public
Schools.

Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However,

"the tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions" and "whether a complaint states a plausible claim for

relief will . . . be a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 679

(2009).

"[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion

without converting the motion to dismiss into a motion for summary judgment." *Tal v.

Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). "This allows the court to take judicial

notice of its own files and records, as well as facts which are a matter of public record."

*Id.* (internal quotations and citation omitted). "However, '[t]he documents may only be

considered to show their contents, not to prove the truth of matters asserted therein.'" *Id.*

(quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

Accordingly, the Court takes judicial notice of the public records in Plaintiffs'

Motion for Judicial Notice [Doc. No. 25] detailing the federal financial assistance

received by OSDE, Noble Public Schools, Moore Public Schools, and HICD, and

documents describing the adoption and substance of policies implementing S.B. 615 by

the Oklahoma State Board of Education, Noble Public School, Moore Public Schools,

and HICD. *See High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th

Cir. 2019) (stating courts may take judicial notice of official government records).

## III.   <u>ANALYSIS</u>

Plaintiffs argue that S.B. 615 prevents them from being treated like other

Oklahoma students and violates their constitutional and statutory rights, specifically under the Equal Protection Clause of the Fourteenth Amendment and Title IX. Conversely, State Defendants argue that S.B. 615 does not unconstitutionally discriminate and is substantially related to an important governmental interest and does not violate Title IX.

### A.    S.B. 615 does not violate the Equal Protection Clause.

Plaintiffs contend that because Bridge and Miles identify as boys but are not treated like all the other boys at their schools (i.e., allowed to use the boys' restroom), they are being unconstitutionally discriminated against in violation of the Equal Protection Clause. They argue similarly for Stiles. Lastly, they maintain that "[t]his discrimination is not simply due to a disparate impact of [S.B. 615]." Pls.' Resp. [Doc. No. 53] at 15.[4] Rather, they contend the discrimination targets Plaintiffs "because they are transgender." *Id.*

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." In essence, it requires "similarly situated" persons to be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Accordingly, for a statute that classifies individuals based on sex to be constitutional, the classification must serve "'important governmental objectives'" and be "'substantially related to the achievement of those objectives.'" *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)

---

[4] The Court uses ECF page numbering.

(quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980)); *see also Craig v. Boren*, 429 U.S. 190, 197, 204 (1976) (analyzing whether unequal treatment based on sex is "substantially related to achievement of the statutory objective").

It is important to note, however, that "[e]qual protection of the laws doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations—two possibilities that might themselves generate rather than prevent injustice." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012) (internal quotations and citation omitted). "Instead, the Equal Protection Clause is a more particular and profound recognition of the essential and radical equality of all human beings." *Id.*

"To trigger the first part of the equal protection test, it's enough to say that the governmental action intentionally discriminates between persons . . . ." *Id.* at 689. Here, S.B. 615 separates individuals based on their biological sex and requires them to use the facilities that correspond to that sex. Thus, the statute classifies individuals based on sex.[5]

---

[5] Because the Court determines that intermediate scrutiny applies since S.B. 615 classifies individuals on the basis of sex, it does not reach the issue of whether transgender status is a quasi-suspect classification.

Further, concerning whether S.B. 615 discriminates based on transgender status, the Court determines, as the Eleventh Circuit did in its rehearing en banc, that "the [law] facially classifies based on biological sex—not transgender status or gender identity. Transgender status and gender identity are wholly absent from the [law's] classification. And both sides of the classification—biological males and biological females—include transgender students." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc). This is further supported by the way S.B. 615 "provide[s] a reasonable accommodation to any individual who does not wish to comply with the" requirement that individuals must use the restroom that corresponds to their biological sex.

To determine whether S.B. 615 survives intermediate scrutiny under the second part of the equal protection test, the Court must identify the State's reasons for enacting a sex-based classification. Then, the Court must ask whether the "reasons qualify as important governmental objectives and, if so, whether the gender-based means employed substantially serve those objectives." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 802 (10th Cir. 2019).

The text of S.B. 615 makes its objective clear: to ensure students' privacy and safety from the opposite sex. Okla. Stat. tit. 70 § 1-125. Although Plaintiffs maintain that the Court must conduct fact finding to determine the validity of this objective, determining what is (and is not) an important governmental objective is a legal question.

Separating students based off biological sex (which both parties agree the statute does) so that they are able to use the restroom, change their clothes, and shower outside the presence of the opposite sex is an important governmental objective.[6] "Understanding

---

[6] In their response brief to the State Defendants' Motion to Dismiss, Plaintiffs assert that, "while the [c]omplaint occasionally refers to multiple occupancy facilities or changing rooms, the Students clarify that they will not seek any relief in this action that applies beyond multiple occupancy restrooms because none of the Students currently has any occasion or need to access multiple occupancy facilities at their schools other than restrooms." Pls.' Resp. [Doc. No. 53] at 12 n.2. *Cf.* Compl. [Doc. No. 1] at 40 (seeking relief for "multiple occupancies and changing facilities"). However, Plaintiffs cannot amend their complaint in their response brief, and the Court does not allow it here. *See* Fed. R. Civ. P. 7(b); *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014) ("We have recognized the importance of Fed. R. Civ. P. 7(b) and have held that normally a court need not grant leave to amend when a party fails to file a formal motion." (quoting *Calderon v. Kan. Dept. of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999))). *See also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (stating that, for Rule 12(b)(6) motions, a court is required to only consider the facts alleged in the complaint). Regardless, the analysis for determining whether Plaintiffs should be provided access to the multiple occupancy restroom or

why is not difficult—school-age children 'are still developing, both emotionally and physically.'" *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804 (11th Cir. 2022) (en banc) (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 636 (4th Cir. 2020), as amended (Aug. 28, 2020) (Niemeyer, J., dissenting)). And the Supreme Court has recognized the need for privacy between members of each sex in intimate settings. *See United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements . . . ."). It has also recognized the State's role in "maintaining . . . safety" "in a public school environment." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 830 (2002).

As Plaintiffs rightly state, "[a]ny law premised on generalizations about the way women are—or the way men are—will fail constitutional scrutiny because it serves no important governmental objective." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 801 (10th Cir. 2019) (internal quotations and citation omitted). However, S.B. 615 addresses much more than mere "generalizations" between males and females. Biological sex is distinct from gender generalizations, and "[u]se of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007), *overruled in part on different grounds in Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019

---

changing facility of their choice is identical.

(10th Cir. 2021).[7]

Having established that Oklahoma has an important governmental interest in ensuring students are safe and have privacy from the opposite sex in restrooms, the Court turns to analyze whether S.B. 615 is substantially related to achieving that objective. Here, the governmental interest is almost identical to the means used to protect the interest. Protecting students' safety and privacy interests in school restrooms and changing areas is undoubtedly closely related to the statute's mandate that all multiple occupancy restrooms or changing areas be for the exclusive use of either the male or female sex as determined by "genetics" and "physiology."[8]

The means by which the statute seeks to further that important governmental interest also make practical sense. In addition to being an "unremarkable—and nearly universal—practice," separating restrooms based on biological sex establishes the

---

[7] As stated in *Tudor*, "*Etsitty* is no longer valid precedent to the extent that it conflicts with *Bostock*." 13 F.4th at 1028. But since *Bostock* did not address restrooms, this portion of *Etsitty* is still binding on this Court.

[8] In *Grimm v. Gloucester Cnty. Sch. Bd.*, the Fourth Circuit held that a restroom policy similar to the one here was "not substantially related to [the school board's] important interest in protecting students' privacy" because although students are entitled to privacy, allowing transgender students to use the restroom of their choice does not alter the amount of privacy students receive. 972 F.3d 586, 613–14 (4th Cir. 2020), as amended (Aug. 28, 2020) ("Put another way, the record demonstrates that bodily privacy of cisgender boys using the boys restrooms did not increase when Grimm was banned from those restrooms. Therefore, the Board's policy was not substantially related to its purported goal."). But this ignores why laws such as S.B. 615 are being passed in the first place. As evidenced by its text, S.B. 615 seeks to ensure students' privacy in intimate settings *from the opposite sex*—not from other students in general. *See* 70 Okla. Stat. § 1-125(B) (stating multiple occupancy restrooms and changing areas are to be for the "exclusive use" of one of the two sexes).

11

clearest limiting principle regarding who can go in what restroom. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796 (11th Cir. 2022) (en banc). If the Court adopted Plaintiffs' position, any biological male could claim to be transgender and then be allowed to use the same restroom or changing area as girls. This is a major safety concern. The Court in no way suggests that Plaintiffs pose any safety risk to other students. It also does not cast any doubt on Plaintiffs' claims regarding the sincerity of how they identify, nor can it on 12(b)(6) review. However, if Plaintiffs' arguments were adopted, it would put school officials in the position of either having to conduct a subjective analysis of the sincerity of an individual's gender identity or merely take their word for it.[9] Not to mention that if (biological) sex-based classifications such as S.B. 615 were deemed to be equal protection violations, no law recognizing the inherent differences between male and female would pass constitutional muster. This is an untenable position.

In sum, S.B. 615 does not violate the Equal Protection Clause.

**B.   S.B. 615 does not violate Title IX.**

Plaintiffs argue that they were subjected to sex discrimination in violation of Title IX because of the way S.B. 615 defines "sex." They argue that since the Supreme Court has concluded transgender status is "inextricably bound up with sex" when analyzing

---

[9] As stated by State Defendants, "[t]o be clear[,] the argument is not that transgender individuals are more likely to be bad actors, but that others could exploit the seemingly standardless concept of 'gender identity' in order to gain access to vulnerable persons." *See* Mot. [Doc. No. 47] at 24.

Title VII, that excluding a transgender student from a restroom on the basis of biological

sex is a violation of Title IX. Pls.' Resp. [Doc. No. 53] at 26. "Title VII, however, is a

vastly different statute from Title IX . . . ." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S.

167, 175 (2005).

Title IX requires that "[n]o person in the United States shall, on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial

assistance . . . ." 20 U.S.C. § 1681(a).[10] However, "nothing contained [in Title IX] shall

be construed to prohibit any educational institution receiving funds under this Act, from

maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. "A

recipient may provide separate toilet, locker room, and shower facilities on the basis of

sex, but such facilities provided for students of one sex shall be comparable to such

facilities provided for students of the other sex." 34 C.F.R. § 106.33. "Title IX is a

broadly written general prohibition on discrimination, followed by specific, narrow

exceptions to that broad prohibition." *Jackson*, 544 U.S. at 175.

"'Whatever temptations the statesmanship of policy-making might wisely

suggest,' the judge's job is to construe the statute—not to make it better" or change it.

*Jones v. Bock*, 549 U.S. 199, 216 (2007) (quoting Frankfurter, Some Reflections on the

Reading of Statutes, 47 Colum. L. Rev. 527, 533 (1947)). This inquiry "must begin[] with

the language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69

---

[10] Defendants do not contest that Noble, Moore, and Oklahoma City Public
Schools receive federal funding.

(2011). "The judge 'must not read in by way of creation,' but instead abide by the 'duty of restraint, th[e] humility of function as merely the translator of another's command.'" *Jones*, 549 U.S. at 216 (quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 533–34 (1947)).

So, since S.B. 615 separates students and the restrooms they are allowed to use based on biological sex, Plaintiffs can only prevail if "sex" under Title IX means the sex with which an individual identifies (i.e., their gender identity), not their biological sex. Accordingly, the Court must necessarily interpret what the word "sex" means in the context of Title IX.

To begin, the Court looks to ordinary public meaning of the word "sex" at the time Title IX was enacted in 1972. At that time, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females—particularly with respect to their reproductive functions." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020), as amended (Aug. 28, 2020) (Niemeyer, J. dissenting) (collecting dictionary definitions). In 1961, the Oxford English Dictionary defined sex as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these." *The Oxford English Dictionary* 578 (1961). In 1970, the American College Dictionary defined sex as "the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished." *The American College Dictionary* 1109 (1970). In 1979, Webster defined it as "the sum of the structural, functional, and behavioral characteristics of living

14

beings that subserve reproduction by two interacting parents and that distinguish males and females." *Webster's New Collegiate Dictionary* 1054 (1979). This is by no means an exhaustive list. However, the above excerpts alone show that at the time Title IX was enacted, "sex" was defined by biology and reproductive functions.

Plaintiffs argue that if the Court focuses exclusively on the term "sex", then it will forget that "'[t]he question isn't just what 'sex' mean[s], but what [a statute barring sex discrimination] says about it.'" *See* Pls.' Resp. [Doc. No. 53] at 27 (citing *Bostock*, 140 S. Ct. at 1739). However, given the text of Title IX, which is different than that of Title VII, the definition of "sex" *is* determinative. Title IX explicitly allows schools to "maintain[] separate living facilities" and "separate toilet, locker room, and shower facilities" for the "different sexes." Thus, if the term "different sexes" is referring to different *biological* sex, then Oklahoma's law is perfectly in sync with Title IX.[11]

At the time Title IX was enacted, the ordinary public meaning of "sex" was understood to mean the biological, anatomical, and reproductive differences between male and female. It is up to Congress to change that meaning, not this Court.

---

[11] Plaintiffs repeatedly argue that the "meaning of 'biological sex' is a politicized one, not one grounded in science." Pls.' Resp. [Doc. No. 53] at 12 n.3. Admittedly, other circuits have reached the conclusions advocated for by Plaintiffs. *See Grimm*, 972 F.3d at 618 (stating that the school board "rel[ied] on its own discriminatory notions of what 'sex' mean[t]" because it defined "sex" by referring to the anatomical and physiological differences between males and females); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017) (concluding that biological sex is merely a "sex-based stereotype[]"). However, for the reasons stated previously and absent binding precedent to the contrary, the Court rejects the view that gender identity is synonymous with biological sex or that biological sex is a stereotype.

Accordingly, S.B. 615 does not violate Title IX because it falls into one of the statute's narrow exceptions allowing schools to require that the different biological sexes use different living facilities such as restrooms.

### C. Granting State Defendants' Motion to Dismiss is proper.

Plaintiffs contend that dismissal is improper because this case involves factual disputes that require discovery before they can be resolved. However, "if, as a matter of law, the complaint . . . is insufficient, a motion to dismiss is proper." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1100 (10th Cir. 2017) (internal quotations and citation omitted). "If such a dismissal operates on the merits of the complaint, it will also ordinarily be entered with prejudice." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

Plaintiffs' complaint makes clear that Bridge's biology is that of a female, Miles's biology is that of a female, and Stiles's biology is that of a male. And, as explained above, the dispositive fact for each of Plaintiffs' claims is their biological sex. No fact-finding conducted by the Court could change this reality or make Plaintiffs' claims cognizable. *See Teigen v. Renfrow*, 511 F.3d 1072, 1075 (10th Cir. 2007) (affirming 12(b)(6) dismissal of an equal protection claim). Therefore, Plaintiffs' claims are legally insufficient, and they have failed to state a claim for which relief may be granted.

## IV.   <u>CONCLUSION</u>

For these reasons, and absent binding Supreme Court or Tenth Circuit precedent to the contrary, the Court concludes that Plaintiffs have failed to state a claim on which relief can be granted. Consequently, the Court GRANTS State Defendants' Motion to

Dismiss [Doc. No. 47] and DISMISSES Plaintiffs' complaint [Doc. No. 1] as to the

State Defendants with prejudice. In light of the Court's dismissal of State Defendants,

the Court denies as moot Plaintiffs' Motion for Preliminary Injunction [Doc. No. 24] as

to the State Defendants.[12]

      IT IS SO ORDERED this 12th day of January 2024.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[12] In light of the above analysis, it is clear that Plaintiffs cannot show a substantial likelihood of success on the merits for their Motion for Preliminary Injunction. Since such a showing is required to obtain a preliminary injunction, the Court refrains from addressing the other necessary factors and denies Plaintiffs' Motion for Preliminary Injunction [Doc. No. 24] as to the remaining defendants. *See State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021) ("When the failure to satisfy one factor is dispositive, a court need not consider the other factors.").

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

ELI BRIDGE, on behalf of Andrew Bridge, a )
minor, by his next friends and parents, et al., )
           )
              Plaintiffs, )
           )
v. )         Case No. CIV-22-00787-JD
           )
INDEPENDENT SCHOOL DISTRICT NO. )
40 OF CLEVELAND COUNTY, )
OKLAHOMA, also known as Noble Public )
Schools, et al., )
           )
              Defendants. )

## <u>ORDER</u>

On January 12, 2024, the Court granted the Motion to Dismiss filed by the State Defendants. [Doc. No. 107]. Now before the Court is the School Defendants' Motion for Judgment on the Pleadings [Doc. No. 114]. Plaintiffs responded [Doc. No. 116], and School Defendants did not reply.

The Court reviews a motion under Federal Rule of Civil Procedure 12(c) "'under the standard of review applicable to a Rule 12(b)(6) motion to dismiss.'" *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223 (10th Cir. 2009) (quoting *Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005)). In reviewing a motion to dismiss, the Court "'must look for the plausibility in the complaint.'" *Id.* (quoting *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007)).

Determining plausibility is a "context-specific task" that requires the judge to use her "experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The

concept of "plausibility" at the dismissal stage refers not to whether the allegations are likely to be true; rather, "[t]he question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191–92 (10th Cir. 2009) (citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)).

The Court already determined that, under the relevant law and assuming the truth of their allegations, Plaintiffs are not entitled to relief against the State Defendants. Although they disagree with the Court's decision, Plaintiffs recognize that the reasoning of the Court's Order of January 12, 2024 "applies equally to Plaintiffs' claims against the School Defendants." [Doc. No. 116 at 2]. Therefore, the Court grants the School Defendants' Motion for the same reasons it granted the State Defendants' Motion to Dismiss. *See* [Doc. No. 107].

IT IS SO ORDERED this 22nd day of March 2024.


_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ELI BRIDGE, on behalf of Andrew Bridge, a minor, by his next friends and parents, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-22-00787-JD |
| OKLAHOMA STATE DEPARTMENT OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

## JUDGMENT

Under Federal Rule of Civil Procedure 58(a), and in accordance with the Court's Orders of January 12, 2024 [Doc. No. 107] and today [Doc. No. 117], the Court dismisses with prejudice Plaintiffs' action against Defendants.

IT IS SO ORDERED this 22nd day of March 2024.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE